# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### San Antonio Division

| | | |
|---|---|---|
| **BCFS HEALTH AND HUMAN SERVICES** | ) | |
| 1506 Bexar Crossing | ) | |
| San Antonio, TX 78232 | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** 5:21-cv-776 |
| | ) | |
| **UNITED STATES DEPARTMENT OF LABOR,** | ) | |
| Frances Perkins Building | ) | |
| 200 Constitution Avenue, N.W. | ) | |
| Washington, DC  20210 | ) | |
| | ) | |
| **MARTY J. WALSH, SECRETARY** | ) | |
| **UNITED STATES DEPARTMENT OF LABOR,** | ) | |
| **in his official capacity,** | ) | |
| Frances Perkins Building | ) | |
| 200 Constitution Avenue, N.W. | ) | |
| Washington, DC  20210 | ) | |
| | ) | |
| **JESSICA LOOMAN, ACTING ADMINISTRATOR** | ) | |
| **WAGE AND HOUR DIVISION,** | ) | |
| **in her official capacity,** | ) | |
| Frances Perkins Building | ) | |
| 200 Constitution Avenue, N.W. | ) | |
| Washington, DC  20210 | ) | |
| | ) | |
| **UNITED STATES DEPARTMENT OF** | ) | |
| **HEALTH AND HUMAN SERVICES,** | ) | |
| Humphrey Building | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, DC 20201 | ) | |
| | ) | |
| **XAVIER BECERRA, SECRETARY** | ) | |
| **UNITED STATES DEPARMENT OF** | ) | |
| **HEALTH AND HUMAN SERVICES** | ) | |
| **in his official capacity,** | ) | |
| Humphrey Building | ) | |
| 200 Independence Avenue, S.W. | ) | |
| Washington, DC 20201 | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF AND DECLARATORY JUDGMENT

### Introduction

1.      This case is the result of a seven year odyssey by the U.S. Department of Labor ("DOL") to grossly overstep its legal authority regarding another federal agency's grant system and the U.S. Department of Health and Human Services' ("HHS") decision to keep its providers in the dark regarding the conflict as to whether the jurisdiction of the Service Contract Act ("SCA"), a prevailing wage statute applicable to federal procurement contracts for services, extends to Cooperative Agreements issued by the Office of Refugee Resettlement ("ORR") pursuant to the Federal Grants and Cooperative Agreements Act ("FGCAA") for the establishment and operation of shelters for unaccompanied minor children. From 2014 through the end of 2020, HHS resisted DOL's insistence that the SCA's jurisdiction should extend to such shelters and did not take proper steps to make the SCA enforceable.  Yet, a month after the 2020 presidential election, HHS changed course and half-heartedly began attempting to add SCA clauses and wage determinations to cooperative agreements in an inconsistent and incomplete manner.  This legally unsupported expansion of SCA jurisdiction exposes all ORR providers to the potential threat of DOL investigations, significant financial penalties, and federal debarment. Notably, this self-inflicted-crisis also occurs against a backdrop of an unprecedented surge of unaccompanied minor children crossing the U.S. border; a global pandemic that spreads especially virulently in crowded conditions and has resulted in a severe shortage of provider staff; overtaxed and depleted ORR budgets; and a political environment super-charged with hostility around the topic of immigration that threatens the very existence of ORR shelters.

1

2.      Plaintiff BCFS Health and Human Services ("BCFS HHS") is currently caught between DOL and HHS and is a victim of the intra-governmental conflict involving the Biden Administration's desire to expand the jurisdiction of existing prevailing wage statutes in a manner not only contrary to law, but also with financial consequences that could place HHS in violation of the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A).

3.      Because the Federal Government apparently cannot – or will not - resolve this matter among itself, BCFS HHS must seek judicial review of DOL and HHS decisions involving the overt misapplication of the SCA by the Secretary of the United States Department of Labor, through the Secretary's designee, the Administrator of the Wage and Hour Division (collectively "DOL").  According to its plain language, the SCA only applies to "contracts."  Historically, neither DOL nor the contracting agencies have applied the SCA to either grants or cooperative agreements.  But now DOL has intentionally and deliberately interpreted the SCA beyond the statute's plain language and legislative history, and beyond the scope of its own implementing regulations and practices in an attempt to improperly expand the SCA's jurisdictional reach. Instead of complying with the SCA and limiting its scope to "contracts", DOL has ordered HHS to improperly insert SCA clauses and wage determinations into cooperative agreements currently active and – most egregiously – those cooperative agreements whose period of performance has already been completed for more than a year.

4.      DOL's and HHS's application of the SCA to cooperative agreements constitutes clear agency overreach and an impermissible expansion of the jurisdiction of the SCA beyond "contracts", as provided in the plain language of the SCA, the SCA's legislative history, DOL's own regulations, the plain language of the FGCAA, and HHS's own grant regulations.  Not surprisingly, DOL itself does not even apply the SCA to its own cooperative agreements.  As

2

such, DOL's and HHS's attempt to expand the jurisdictional reach of the SCA to cooperative agreements should be set aside, and enjoined, pursuant to the Administrative Procedure Act as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706.

### Parties & Jurisdiction

5.      Plaintiff BCFS Health and Human Services is a Texas nonprofit corporation with its principal place of business in San Antonio, TX.

6.      Plaintiff is entitled to judicial review under 5 U.S.C. § 702.

7.      Defendant United States Department of Labor ("DOL") is a federal Executive Branch Agency.

8.      Defendant Marty J. Walsh is the Secretary of the United States Department of Labor.  Secretary Walsh is sued only in his official capacity.

9.      Defendant Jessica Looman is the Acting Administrator of the United States Department of Labor's Wage and Hour Division.  Acting Administrator Looman is sued only in her official capacity.

10.     The Defendant Secretary of Labor was responsible, in his official capacity, for issuing the decisions/orders at issue in this case though his designee, the Administrator of the Wage and Hour Division of the Department of Labor.

11.     Defendant United States Department of Health and Human Services ("HHS") is a federal Executive Branch Agency.

12.     Defendant Xavier Becerra is the Secretary of the United States Department of Health and Human Services.  Secretary Becerra is sued only in his official capacity.

3

13.     The Defendant Secretary of HHS was responsible, in his official capacity, for issuing the decisions/orders at issue in this case though his designee, the Director of the Office of Refugee Resettlement.

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*.

15.     Venue is proper in this District and Division pursuant to 28 U.S.C. § 1391(e)(1)(C) because no real property is involved in this APA action against the United States and the Plaintiff resides in this District and Division.

**Service Contract Act Basics**

16.     The SCA (41 U.S.C. §§ 6701-6707) is a 1960's federal statute setting minimum wage and fringe benefit standards for contractors working on federal procurement contracts exceeding $2500 and having as their principal purpose the furnishing of services in the United States through the use of service employees.  The SCA only applies to "contracts" covered by the statute.  The SCA is administered by the DOL's Wage and Hour Division.

17.     To the extent the SCA applies, the SCA obligates contractors and all tiers of their subcontractors to pay service employees – based on each employee's distinct job classification - no less than the wage rates and fringe benefits prevailing in the locality for each job classification, as periodically determined by DOL in published Wage Determinations.

18.     The SCA is not self-effective.  In order for the SCA to apply, both the required "contract" clause and any applicable Wage Determinations must be expressly made part of a "contract" with the United States Government.  In the absence of a proper "contract" clause, there is nothing for DOL to enforce.  In the absence of a Wage Determination, "contractors" are simply required to pay their employees no less than the Fair Labor Standards Act minimum

wage.  In the absence of both a proper "contract" clause and the clear physical incorporation of Wage Determinations therein, the SCA does not and cannot apply, as a matter of law.

19.     "Prime contractors" are potentially liable for the SCA non-compliance of their vendors/subcontractors, particularly if the "prime contractor" does not "flowdown" the SCA "contract" clauses to such vendors/subcontractors.

20.     Contractor non-compliance with the SCA potentially carries stiff penalties.  The SCA provides authority for the government to withhold contract funds to reimburse underpaid employees "from accrued payments due on the contract or on any other contract between the same contractor and the Federal Government", terminate contracts, and hold the contractor liable for associated costs to the government.  41 U.S.C. § 6705.

21.     On top of the foregoing penalties, the SCA carries a statutory presumption that, absent unusual circumstances, any "contractor" found not in compliance with the SCA (as well as its principal managers and employees) shall be debarred from obtaining any future government contracts for a period of three years.  41 U.S.C. § 6706.

22.     The devastating and irreparable effects of being placed on the GSA's Excluded Parties list extend far beyond the scope of federal contracts and other federal financial assistance. Many state and local government also review the Excluded Parties List to determine the eligibility of contractors/entities for the receipt of state and local funds.  Several of the states in which BCFS HHS routinely operates – including Texas - expressly rely on the GSA Excluded Parties list to make responsibility determinations.  *See, e.g.*, *Debarred Vendor List*, Texas Comptroller of Public Accounts, https://comptroller.texas.gov/purchasing/programs/vendor-performance-tracking/debarred-vendors.php (last visited Aug. 14, 2021) ("Agencies and Texas Smartbuy members may wish to check the list of vendors excluded from doing business on the

federal level. The System for Award Management, or SAM, can be used as a resource for purchasing entities.").  Hence, any potential action by DOL to place BCFS HHS on the federal GSA Excluded Parties list for alleged noncompliance with the SCA will have wide ranging and catastrophic impacts on BCFS HHS which receives funds for almost all of its operations from a variety of federal, state, and local governments.  The debarment penalty has been called "the executioner's axe."

23.     In light of the severe penalties facing "prime contractors" for noncompliance with the SCA, "prime contractors" typically have significant administrative and oversight regimes and costs to ensure that both they and their vendors/subcontractors comply with SCA requirements.

**ORR Migrant Children Shelter Program**

24.     As a result of the 1997 *Flores v. Reno* Settlement, the Trafficking Victims Protection Act of 2000 and its reauthorization acts, and the William Wilberforce Trafficking Victims Protection Reauthorization Act (TVPRA) of 2005 and 2008, minors from foreign countries who are found to be in the United States without a parent or guardian are taken into the custodianship of the U.S. Health and Human Services – Office of Refugee Resettlement (ORR). ORR supports a national network of residential facilities – operated by private, non-governmental providers – that care for youth until they can be unified with a family member or sponsor in the U.S.  These sites may be group homes or individual foster homes, based on the unique needs of the minor.  During their time at a permanent ORR site, youth receive medical and mental health care, education, recreation, case management, many opportunities to call family in their home country, and other services – with the goal of providing comfort and hope for the youth after a likely traumatic journey to the U.S.

HB: 4848-3763-8900.9

25.     Beginning in 2012, the ORR system experienced an influx of unaccompanied minors that outpaced the number of available permanent beds.  In response, ORR stood up temporary sites that could care for youth during a surge in migration.  While migration patterns have ebbed and flowed in the years since, the U.S. saw the largest spikes in the number of minors making the dangerous journey alone to the U.S., predominantly from Central America, in 2014, 2019 and, presently, 2021.  Today, more than 15,000 youth are in the custody of ORR, though the national bed capacity is less than 12,000.

26.     Over the years, ORR developed a strategy to establish temporary "influx" sites that are operational only during times of increased migration.  BCFS HHS has operated multiple ORR "influx" sites over the years and has remained resolute in ensuring sites meet high standards for child welfare and provide services in accordance with the *Flores* Settlement. Ultimately, the federal government aims to establish more permanent bed capacity nationwide; but that takes time.

27.     This year (2021) has already seen record-breaking migration, especially among unaccompanied minors.  *See, e.g.*, Nick Miroff, *July was busiest month for illegal border crossings in 21 years, CBP data shows*, WASH. POST., Aug. 12, 2021, https://www.washingtonpost.com/national/record-numbers-illegal-border-crossings/2021/08/12/e3d305e2-facd-11eb-b8dd-0e376fba55f2_story.html.  While crossings historically have tended to decline in hot summer months, that is not happening in 2021.  For instance, more than 800 youth were apprehended by the U.S. Border Patrol on one August day alone.  Without an abatement in new border crossings, and set against a system already operating at lower capacity due to COVID-19 requirements for quarantine and social distancing, the ORR system is under extreme duress.

HB: 4848-3763-8900.9

### BCFS Health And Human Services

28.     For more than 75 years, BCFS HHS has cared for individuals, families and communities in their greatest time of need.  Founded as an orphanage for Hispanic children – at a time when children's homes were strictly segregated – the organization not only began its humanitarian mission as a place for vulnerable children with nowhere else to go, but also as a unique government partner with the creativity, reliability and agility required to fill unmet needs.

29.     During President George W. Bush's administration, BCFS HHS was asked to establish a residential facility that would serve a unique population of children: unaccompanied minors who arrived in the United States from other countries without a parent or guardian.  In the decade since, the demand for such services grew exponentially.  Today, BCFS HHS operates nine permanent facilities in multiple states on behalf of HHS's Office of Refugee Resettlement ("ORR").  These sites provide comfort, clothing, medical and mental health care, case management, education and recreation for thousands of children – aged 2-17 – each year.

30.     As a national leader in all-hazards disaster response, BCFS HHS was tapped in 2012 by the federal government to establish temporary "influx" sites to care for children when the national ORR permanent bed system reached capacity.  Blending the BCFS System's unique subject matter expertise – disaster response and child welfare – the organization became a critical partner for HHS during times of high border crossings of unaccompanied minors.  The organization has led temporary influx shelter operations in multiple states eight times in the last ten years.

31.     In 2018, BCFS HHS was tasked to operate an ORR emergency influx site in Tornillo, Texas.  The operation was not only largescale (defined as a "Type 1" incident according to FEMA response standards), but also highly complex.  The location, chosen by

HB: 4848-3763-8900.9

HHS, was in a remote area of Texas, requiring BCFS HHS to essentially build a city in a desert – importing water, toilet and bathing stations, fuel, electricity, laundry services, daily hot food service, soccer fields and other recreational activities, urgent care-level medical capabilities, EMS, Wi-Fi and technology resources, and housing for thousands of children as well as responders.

32.     BCFS HHS celebrated holidays with the children – from holding a 4th of July parade to providing a small, thoughtful gift to every child on Christmas (funded through the organization's endowment, not federal funds).  Birthdays were also recognized; children cheered for their home country during the World Cup; and BCFS EMD's first responders created a "Firefighting Academy" where both boys and girls could learn the basics of firefighting.  In seven months, the organization cared for 6,375 unaccompanied minors at the Tornillo facility.  In a letter sent to BCFS HHS following the end of the Tornillo operation, U.S. HHS Assistant Secretary Ann Johnson wrote: "I was deeply moved when I personally observed how each child was treated with dignity and respect by your staff members." She also noted that BCFS HHS was "absolutely critical to the ORR operation… [ensuring] that the unaccompanied children (UAC) are transferred out of border patrol stations in a timely fashion, in accordance with the law."

33.     Toward the end of 2020, it became clear to the federal government that another increase in unaccompanied minor crossings at the border was imminent, and BCFS HHS was contacted about standing up an influx shelter in Carrizo Springs, Texas.  In February 2021 an activation order was received and the site began accepting youth, ages 12-17.  Together with ORR, BCFS HHS cross-walked all applicable state licensing standards to ensure the highest levels of child welfare at the site – a former housing location for oilfield workers.  In many cases, in fact, the site exceeds state licensing standards.

34.     COVID-19 required new considerations for mass sheltering.  As the State of Texas' lead medical response partner during the pandemic – staffing hospitals, nursing homes and other congregate care settings, as well as leading vaccination clinics and providing mobile vaccination and monoclonal infusion teams – BCFS HHS was uniquely equipped to protect children and staff from spread of the illness, and care for those who tested positive.  The organization donated use of its negative pressure BLUMED tents to care for COVID-positive children, with a bed capacity of 273; and was a dedicated site to receive minors who presented symptoms or tested positive for COVID-19. BCFS HHS's epidemiologists are on-site daily, and the site has hosted several visits from CDC and other public health agencies. Congressman Chip Roy lauded BCFS HHS' expertise following his visit to Carrizo Springs, stating: "BCFS is doing a great job… BCFS knows how to handle these types of situations . . . ."  Tammy Prout, *Roy discusses border, FEMA and vaccines*, Hill Country Community J., Mar. 24, 2021, https://www.hccommunityjournal.com/article_e0bfef7a-8c08-11eb-9712-5f51ec571014.html.

35.     Flexibility at the Carrizo Springs Influx Facility has been critical, and BCFS HHS has been able to adjust regularly to meet the current needs of ORR.  For example, the site reallocated dormitories and staffing ratios to be able to care for children as young as eighteen months old.  BCFS HHS produces a "daily news" report – akin to a school's morning announcements – that's read each morning to youth by their care workers, which shares fun tidbits like sport scores, "this day in history" fun facts, weather, birthdays at the site, and more. Additionally, the organization has continued the Tornillo influx facility's popular "Firefight Academy" for older youth, in addition to other special events..

36.     BCFS HHS's Carrizo Springs operation leads all ORR providers in the expediency of ensuring safe unification of children with family or sponsors.  The site has been

10

acknowledged by media and elected officials from both parties as a safe, caring location that meets – and in many cases exceeds – children's temporary needs. One media outlet emphasized how well children's personal, medical and physical needs were met, including providing recreational opportunities for youth such as a soccer field equipped with lights for night games. Tiffany Hudson & Markie Martin, *First look inside facility for migrant children as Biden administration faces border challenge*, OKLA. NEWS, Mar. 25, 2021, https://kfor.com/news/first-look-inside-facility-for-migrant-children-as-biden-administration-faces-border-challenge/. Following her in-person tour, Congresswoman Sylvia Garcia – a former social worker - shared a message on Twitter: "Rest assured that the children are being taken care of." Rep. Sylvia Garcia (@RepSylviaGarcia), TWITTER (Mar. 24, 2021, 5:03 PM), https://twitter.com/RepSylviaGarcia/status/1374874497501761536.

37.     For all of its cooperative agreement operations, BCFS HHS has paid and continues to pay its employees total compensation well above the levels that could be required by applicable SCA wage determinations both before and after HHS's and DOL's actions at issue in this case and without regard to any alleged SCA jurisdiction.

### HHS Has No Independent Obligation To Include SCA Clauses In Any Cooperative Agreements

38.     Neither HHS nor ORR are under any statutory obligation to include the SCA in any cooperative agreement for unaccompanied migrant children shelter services.  The SCA's construction counterpart, the Davis Bacon Act, has been expressly incorporated into a variety of substantive federal statutes requiring a variety of federal agencies to include Davis Bacon Act provisions in contracts regardless of whether the DOL itself has determined the statute to apply. *See, e.g.*, Federal-Aid Highways Acts; American Recovery and Reinvestment Act of 2009; Housing and Community Development Act of 1974, HOME Investment Partnerships Act, and

11

the Native American Housing Assistance and Self-Determination Act of 1996.  Unlike its treatment of the Davis Bacon Act, Congress has not included any SCA requirements in any federal statutes that HHS or ORR administer.  Nor is SCA jurisdiction required as part of Section 412(c)(1)(A) of the INS Act, which is the sole substantive statutory authority listed on the face of the cooperative agreements at issue in this case.

39.     There is similarly no regulatory requirement on HHS or ORR to require SCA compliance in connection with any of its cooperative agreements.  Specifically, there is no mention of the SCA in any HHS or ORR substantive regulations, 45 C.F.R. Part 75 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements for HHS Awards), the HHS Grant Policy Statement (U.S. Department of Health and Human Services, *Grants Policy Statement*, Jan. 1, 2007, https://www.hhs.gov/sites/default/files/grants/grants/policies-regulations/hhsgps107.pdf); or 2 C.F.R. Part 200 (Uniform Administrative Requirements, Cost Principles, and Audit Requirements, Cost Principles, and Audit Requirements for Federal Awards).

40.     In short, neither HHS nor ORR are under any obligation from any federal statute they administer or any related regulation or published internal guidance of which BCFS HHS is aware to require SCA compliance in connection with any cooperative agreements issued by HHS or ORR.

**DOL/HHS Battle Over SCA Jurisdiction**

41.     On or about December 15, 2014, Timothy Helm, Chief, Branch of Government Contracts Enforcement at the DOL's Wage and Hour Division wrote to Alexis Williams, Procurement Analyst at HHS regarding whether the SCA applied to BCFS HHS's cooperative agreement 90ZU0112 with the Office of Refugee Resettlement.  Exhibit 1.  Mr. Helm's letter

notes HHS's position "that your agency has determined that cooperative agreements are outside the scope of SCA coverage." Exhibit 1 at 1. Despite acknowledging HHS's position is based on the Federal Grants and Cooperative Agreements Act, Mr. Helm states "[w]e have carefully reviewed the cooperative agreement in the reference contract, and it is our view that this contract is subject to the SCA. . . . Please review this matter and provide us with a report of your action within 20 days of the date of this letter." *Id*. at 2. This was only the opening salvo in a long battle between HHS and DOL over SCA jurisdiction over cooperative agreements.

42.     On or about February 8, 2019, DOL Wage and Hour Division Enforcement Coordinator Robert Burris wrote to Toby Biswas of the HHS Office of Refugee Resettlement regarding BCFS HHS cooperative agreement 90ZU0224 and the applicability of the SCA. Exhibit 2. Mr. Burris noted that HHS "advised our Investigator that a 'Cooperative Agreement is not a contract but a grant mechanism.' In addition, you advised that 'to be absolutely clear, BCFS is an ORR grantee (not a contractor) operating under a Cooperative Agreement.' Furthermore, you advised 'a Cooperative Agreement is not a contract.'" *Id*. at 1. At that point, Mr. Burris doubled down on DOL's position that the SCA applies to HHS cooperative agreements in general and to BCFS HHS's cooperative agreement – 90ZU0224 – specifically and stated "Therefore, as per the SCA, 29 CFR Part 4, the U.S. Department of Health and Human Services, within 30 days from notification by the U.S. Department of Labor, shall incorporate the McNamara O'Hara Service Contract Act of 1965, as amended, labor standards and appropriate wage determinations, retroactive from the date of award, into the cooperative agreements associated with BCFS Health and Human Services." *Id*. at 3.

43.     HHS did not comply with the requests made in DOL's February 2019 correspondence, so Michele R. King, Director, Branch of Government Contracts Enforcement

for the DOL's Wage and Hour Division wrote to Toby Biswas of HHS ORR on June 17, 2019.
Ms. King's letter "is in response to a letter dated February 8, 2019, and an email dated March 7,
2019 that was sent to your office by the U.S. Department of Labor's Wage and Hour Division . .
. concerning . . . [a] cooperative agreement between the U.S. department of Health and Human
Services (HHS) and the Baptist Child Family Services (BCFS) Health and Human Services to
provide residential services for unaccompanied children located at facilities in Tornillo,
Harlingen, La Feria, and Raymondville, Texas."  Exhibit 3 at 1.  Ms. King's letter again
recognized HHS's argument that cooperative agreements should not be covered by the SCA by
reference to the FGCAA.  *Id.*  Nonetheless, Ms. King insisted that DOL has determined the SCA
applies to BCFS HHS's cooperative agreement 90ZU0224 – before having conducted or
completed any investigation of BCFS HHS or any of its vendors/subcontractors.  Ms. King
concluded her letter to HHS instructing HHS to insert specific wage determinations into
90ZU0224 and report back to DOL within "10 days of the date on this letter and provide our
office with copies of the respective signed [cooperative agreement] modifications."  *Id.* at 3.

44.     BCFS HHS first became aware of the correspondence between HHS and DOL in
Exhibits 1 through 3 and the subjects contained therein on or about June 4, 2021, in response to a
Freedom of Information Act request to DOL made by one of BCFS HHS's
vendors/subcontractors.  At no point prior to June 2021 had either HHS or DOL informed BCFS
HHS that there were ongoing discussions between HHS and DOL regarding whether the
jurisdiction of the SCA extends to HHS issued cooperative agreements.

45.     HHS took no action to comply with the direction DOL provided regarding SCA
jurisdiction over cooperative agreements and did not insert the wage determinations DOL

requested at any time from February 2019 until December 2020 - more than a month after 2020

Presidential Election.

## HHS Cooperative Agreements And Notices Of Award

46.     HHS and BCFS HHS signed Cooperative Agreement 90ZU0224, "for the care

and placement of unaccompanied children (UC) in accordance with . . . 6 U.S.C. § 279," on or

about April 17, 2017.  Exhibit 4 at 1.

47.     Cooperative Agreement 90ZU0224 states, in relevant part:

SECTION III:  Authority

As provided by the terms of the Federal Grant and Cooperative Agreement Act of
1977 (FGCAA), 31 U.S.C. §6301, as amended, the grant awarded establishes a
Cooperative Agreement between the Office of Refugee Resettlement (ORR) and
BCFS HHS.  Pursuant to the FGCAA, this cooperative agreement (hereinafter
"agreement") provides for substantial involvement and collaboration of ORR in
activities related to cooperative agreements for residential services.

Exhibit 4 at 3-4.

48.     Cooperative Agreement 90ZU0224 has an explicit "Project Period" from

February 1, 2017 through January 31, 2020.  Exhibit 4 at 31.

49.     HHS issued an amended Year 1 Notice of Award (Award # 90ZU0224-01-07) to

BCFS HHS on December 27, 2020, which for the first time – and nearly a year after the

conclusion of the stated Project Period for the cooperative agreement – attempted to clarify SCA

jurisdiction and include a Wage Determination by stating:  "This action retroactively incorporates

the US Department of Labor Wage Determinations:  Number 2015-5219, Revision 2; Number

2015-5219, Revision 5; Number 2015-5302, Revision 2; Number 2015-5309, Revision 5."

Exhibit 5 at 1.

50.     ORR, on December 28, 2020, issued two similar amended Notices of Award for

Years 2 and 3:

- Award #90ZU0224-02-17 which states, in relevant part: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-5219, Revision 5; Number 2015-5219, Revision 8; Number 2015-5302, Revision 5; Number 2015-5309, Revision 8." Exhibit 6 at 1.

- Award # 90ZU0224-03-04 which states, in relevant part: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-5219, Revision 8; Number 2015-5309, Revision 8." Exhibit 7 at 1.

51.    Three months later, on March 31, 2021 (and more than a year after the Project

Period for 90ZU0224 concluded), HHS issued three additional amended Notices of Award, one

for each performance year:

- Award # 90ZU0224-01-08 amended the Year 1 SCA compliance direction to state: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-2511, Rev. 5; Number 2015-5529 Rev. 5." Exhibit 8 at 1.

- Award # 90ZU0224-02-19 amended the Year 2 SCA compliance direction to state: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-5529 Rev. 5; Number 2015-5529 Rev 7." Exhibit 9 at 1.

- Award # 90ZU0224-03-06 amended the Year 3 SCA compliance direction to state: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-5529 Rev 7." Exhibit 10 at 1.

52.    Finally, on April 16, 2021 (again over a year after the Project Period for

90ZU0224 concluded), ORR issued three more amended Notices of Award:

- Award # 90ZU0224-01-09 further amended its Year 1 SCA compliance direction to state: "[t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-2511, Rev. 5; Number 2015-5229 Rev. 5." Exhibit 11 at 3.

- Award # 90ZU0224-02-20 further amended the Year 2 SCA compliance direction to state: "[t]his award is subject to the provisions of the Service Contract Act requirements at 29 CFR 4.6 . . . [t]his action retroactively incorporates the US Department of Labor Wage Determinations: Number 2015-5529 Rev. 5; Number 2015-5529 Rev 7." Exhibit 12 at 3.

- Award # 90ZU0224-03-07 further amended the Year 3 SCA compliance direction to state: "[t]his award is subject to the provisions of the Service Contract Act requirements at 29 CFR 4.6 . . . [t]his action retroactively incorporates the US

16

Department of Labor Wage Determinations: Number 2015-5529 Rev 7." Exhibit 13 at 1.

53. Each of the foregoing Notices of Award in Exhibits 5 through 13 expressly stated that the HHS Grants Policy Statement and "45 CFR Part 75 directly apply to this award." On a subsequent page of each Notice of Award, it states "This award is subject to the requirements as set forth in 45 CFR Part 87 [and] This grant is subject to the requirements as set forth in 45 CFR Part 75."

54. Neither BCFS HHS nor its vendors/subcontractors are likely in compliance with the SCA requirements that were retroactively imposed on 90ZU0224 a year after the period of performance ended. While total compensation likely exceeds the SCA prevailing wage, the SCA also contained detailed Health and Welfare, vacation, and holiday benefits which are not ordinarily furnished to temporary workers. BCFS HHS was not contemporaneously informed of potentially applicable wage determinations or other issues concerning wages and benefits that HHS now seeks to impose retroactively on BCFS HHS and thus could not structure benefit plans to be fully compliant with the SCA. More importantly, BCFS HHS's vendors/subcontractors are likely not in compliance because BCFS HHS did not and could not have flowed down any SCA "contract clauses" or wage determinations to such vendors/subcontractors prior to the end of the performance period because those requirements were not placed on BCFS HHS until after all work of its vendors/subcontractors was completed and all of their respective employees already paid for work performed.

55. BCFS HHS objected to HHS's actions in an April 28, 2020 letter to Grants Management Specialist Gerald Scroggins. Exhibit 14. To date, HHS has never formally responded to the objections BCFS HHS raised in the April 28th letter.

HB: 4848-3763-8900.9

**DOL, In Apparent Coordinated Effort With HHS, Begins SCA Enforcement Proceedings Days Later**

56.     On or about April 27, 2021 (and only eleven days after HHS issued its final batch of amended and fully retroactive Notices of Award for 90ZU0224), DOL Investigator Alejandro Santos contacted BCFS HHS to inform the Plaintiff that DOL was commencing an SCA audit/investigation of BCFS HHS pertaining only to cooperative agreement 90ZU0224 and the December 2020 and early 2021 Notices of Award.  During that initial phone call, BCFS HHS's counsel explained to Mr. Santos that the SCA does not and cannot apply to any cooperative agreements, as a matter of law.

57.     On or about April 28, 2021, BCFS HHS's counsel sent to Mr. Santos a copy of the letter BCFS HHS's counsel had sent to HHS earlier the same day objecting to SCA jurisdiction over cooperative agreements and related matters concerning 90ZU0224.

58.     On or about May 12, 2021, DOL Investigator Michael Espitia sent BCFS HHS's counsel a formal letter initiating DOL's SCA investigation of BCFS HHS.  DOL's current investigation is confined solely to "Contract 90ZU0224" – BCFS HHS's cooperative agreement with HHS/ORR.  *See* Exhibit 15.

59.     Subsequent thereto, counsel for BCFS HHS once again explained to another DOL investigator how and why the SCA does not and cannot apply to cooperative agreements.

60.     On May 19, 2021, BCFS HHS, through counsel, responded to Mr. Espitia's request for documents in connection with DOL's SCA investigation and objected to the application of the SCA to BCFS HHS's 90ZU0224 cooperative agreement:

> Primary among BCFS's objections and concerns related to your May 12, 2021 request for documents (the "Letter") is DOL's apparent misunderstanding as to the legal relationship between BCFS and the U.S. Department of Health and Human Services (HHS).  In the Letter, DOL makes reference to "Contract 90ZU0224."  There is no "contract."  There is, however, a "cooperative

18

agreement" between BCFS and HHS.  As I discussed at length in my April 28, 2021 letter to Gerald Scroggins of HHS (a copy of which I sent to your predecessor, Wage and Hour Investigator Alejandro Santos and which you acknowledged DOL has received and reviewed), the SCA only covers 41 U.S.C. § 6702 "contracts." A "cooperative agreement" is not a "contract" under the plain language of the Federal Grant and Cooperative Agreements Act.  See 31 U.S.C. §§ 6303-6305.  A courtesy copy of my April 28th letter is attached hereto for your reference.

As such, BCFS has no "contract" to produce in connection with its work on cooperative agreement 90ZU0224.  Consistent with the arguments in my April 28th letter and for additional jurisdictional reasons that I will raise in subsequent correspondence, BCFS objects to DOL's attempt in its Letter to conflate the terms "contract" and "cooperative agreement" when the plain language of the SCA, DOL's own SCA regulations, and the plain language of the Federal Grant and Cooperative Agreements Act point to a clear legal distinction between the two. The FAR 2.101 definition of a "contract" makes this distinction crystal clear – "Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301 et seq."  Please identify any applicable statutes, regulations, policy guidance, or court or administrative decisions that rebut the jurisdictional and coverage arguments in my April 28th letter and/or support DOL's apparent attempt to conflate "contracts" and "cooperative agreements" as being one and the same.

Exhibit 16 at 2-3.  To date, no one from DOL has provided a response to the May 19th letter or provided any explanation to BCFS HHS or its counsel as to how or why the SCA can or should apply to cooperative agreements.

61.     On May 28, 2021, counsel for BCFS HHS sent another letter to Mr. Espitia raising additional objections to SCA jurisdiction over cooperative agreements generally, and as it relates to DOL's investigation into cooperative agreement 90ZU0224 specifically.  *See* Exhibit 17.  After raising a host of new and different objections, BCFS HHS expressly requested "that DOL provide an appropriately detailed legal justification and explanation for DOL's SCA jurisdiction here as well as a response to the other legal and policy issues addressed above and in my prior correspondence."  *Id* at 10.  To date, DOL has not provided any such explanation or justification.

62.     In addition to the pending investigation against BCFS HHS, DOL also initiated a SCA investigation against one of BCFS HHS's vendors under cooperative agreement 90ZU0224 – Favorite Healthcare Staffing ("Favorite").

63.     DOL's investigation of Favorite is ongoing.  On or about July 2, 2021, the lead investigator for DOL, Lourdes Torres, wrote to Favorite's counsel: "The subcontract (MOU) between BCFS and Favorite Healthcare Staffing did not include SCA stipulations and therefore SCA is not applicable to Favorite.  However, SCA is applicable to the prime contract. BCFS failed to pass down and include that information on the subcontracts.  Nonetheless, the SCA is applicable to the employees performing the work called for on the prime contract and this includes Favorite's employees.  If any violations or back wages are found due to Favorite's employees, it will be handled under BCFS rather than Favorite Healthcare Staffing."  Exhibit 18.

64.     Based on the timing of HHS's decision to retroactively attempt to include both SCA clauses and Wage Determinations in December 2020, March 2021, and April 2021 – all long after the period of performance for work on 90ZU0224 ended and without providing BCFS HHS any opportunity to contemporaneously flowdown the clauses to any of its vendors/subcontractors – and based on DOL investigator's express comments to Favorite prejudging BCFS HHS's alleged liability under the SCA, it is likely that BCFS HHS will be found liable by DOL for SCA noncompliance on its own behalf and on behalf of its vendors/subcontractors in connection with the currently pending DOL investigation which is premised entirely on HHS adding SCA requirements nearly a year after the period of performance on 90ZU0224 was completed.

**BCFS HHS's Threat To Close Facilities And DOL/HHS Response Thereto**

65.     Sometime in mid-June 2021, BCFS HHS was informed by HHS that HHS wanted to continue working with BCFS HHS to provide unaccompanied migrant children shelter services at the Carrizo Springs facility located in Carrizo Springs, TX.

66.     BCFS HHS was informed by HHS that the existing cooperative agreement (90ZU0208) had reached its maximum number of allowable extensions and maximum obligated funding allowable and that HHS was going to move the existing Carrizo Springs operations from the then current cooperative agreement to a different and existing cooperative agreement - 90ZU0334.  HHS informed BCFS HHS that the change in cooperative agreements would need to take place on or before July 12, 2021.

67.     The previous cooperative agreement for Carrizo Springs (90ZU0208) did not properly invoke the SCA or contain any wage determinations.

68.     HHS informed BCFS HHS that upon transferring the funding for Carrizo Springs from 90ZU0208 to 90ZU0334, HHS intended to insert SCA clauses and wage determinations and insist on full SCA compliance from BCFS HHS.

69.     BCFS HHS explained to HHS that, even if the SCA could apply to cooperative agreements in general or 90ZU0334 specifically, BCFS HHS and its all of vendors/subcontractors could not possibly become SCA compliant in the extremely short timeframe HHS was providing.

70.     After much continuing discussions, BCFS HHS notified HHS in late June 2021 that BCFS HHS intended to close the Carrizo Springs facility, if HHS insisted on SCA compliance on such short notice.

21

71.     BCFS HHS's ultimatum prompted a swift and high level response from the Federal Government.  On July 1, 2021 at approximately 1 pm ET, HHS convened a Zoom conference with BCFS HHS in an attempt to convince BCFS HHS to keep Carrizo Springs open and apply the SCA.  In attendance at the Zoom conference were, Defendant Jessica Looman, ORR Director Cindy Huang, Jooyeun Chang (Acting Assistant Secretary of the Administration for Children and Families), the chiefs of staff for the Secretaries of both HHS and DOL, and many high ranking lawyers from both the HHS Office of General Counsel and the DOL Solicitor's Office.

72.     At the July 1, 2021 Zoom call, both DOL and HHS counsel admitted to having read the April 28, 2021, May 19, 2021, and May 28, 2021 letters from BCFS HHS's counsel to HHS and DOL concerning why and how the SCA cannot and should not apply to cooperative agreements.  BCFS HHS once again objected to the application of the SCA to any cooperative agreements.  DOL outright rejected BCFS HHS's objections and simply stated that the SCA "must" apply to cooperative agreements without providing any legal explanation or justification. HHS acquiesced to DOL's position on the applicability of the SCA and indicated that HHS planned to include SCA clauses and wage determinations in all future cooperative agreements and related notices of award.

73.     Given the Federal Government's pressing humanitarian need for unaccompanied migrant children shelters and BCFS HHS's mission and overwhelming concern for the well-being of unaccompanied minor children despite its strenuous objections to the application of the SCA to cooperative agreement 90ZU0334, BCFS HHS, DOL, and HHS reached an understanding.  HHS said it would insert the SCA clauses and wage determinations into a special Notice of Award related to 90ZU0334 that would apply exclusively to Carrizo Springs and no

other operations otherwise covered by cooperative agreement 90ZU0334. DOL would prepare a "back of the napkin" estimate of the increased funding HHS would need to provide to BCFS HHS assuming the SCA really applied. And, BCFS HHS preserved its objections to SCA jurisdiction over cooperative agreements and expressly reserved its right to challenge DOL's and HHS's improper expansion of SCA jurisdiction to cover cooperative agreements.

74.    On or about July 12, 2021, HHS issued NOA 90ZU0334-02-04 which included the approximately $10 million in increased funding DOL recommended to HHS to cover only ninety (90) days of operations at Carrizo Springs, but failed to properly insert any SCA "contract" clauses and attempted to incorporate two separate wage determinations. NOA 90ZU0334-02-04 gave BCFS HHS 90 days from July 13, 2021 (until approximately October 11, 2021) to become SCA compliant. Exhibit 19.

75.    On July 23, 2021, BCFS HHS objected to NOA 90ZU0334-02-04, with regards to the inclusion of any SCA clauses or wage determinations in general, as well as to specific SCA and related failings in the same NOA. Exhibit 20.

76.    On August 13, 2021, HHS issued NOA 90ZU0334-02-06 which attempts to incorporate the 29 C.F.R. 4.6 "contract" clause and two DOL created wage determinations into cooperative agreement 90ZU0334 specifically for the Carrizo Springs operation. Exhibit 23. BCFS HHS objected to NOA 90ZU0334-02-06 with regards to the inclusion of any SCA clauses or wage determinations because the SCA does not apply to cooperative agreements issued pursuant to the FGCAA. Exhibit 24.

77.    HHS's failure to address BCFS HHS's objections and/or timely insert SCA "contract" clauses has caused and will continue to cause harm to BCFS HHS. Among other reasons, HHS's failure to timely include all of the required "contract" clauses effectively

23

precluded BCFS HHS from "flowing down" 29 C.F.R. 4.6 and the two wage determinations to BCFS HHS's vendors/subcontractors until more than one third of the ninety day compliance period has passed,  thereby delaying any possible compliance with the SCA (assuming it even applies to cooperative agreements) and unduly adding to BCFS HHS's and its vendors' administrative burden and legal exposure under the SCA.

78.     Each of the foregoing Notices of Award in Exhibits 5 through 13, 19, and 23 expressly state that the HHS Grants Policy Statement and "45 CFR Part 75 directly apply to this award."  On a subsequent page of each Notice of Award, it states "This award is subject to the requirements as set forth in 45 CFR Part 87 [and] This grant is subject to the requirements as set forth in 45 CFR Part 75."

79.     HHS and BCFS HHS signed Cooperative Agreement 90ZU0334, "for the care and placement of unaccompanied children (UC) in accordance with . . . 6 U.S.C. § 279," on or about November 10, 2020.  Exhibit 21.

80.     Cooperative Agreement 90ZU0334 states, in relevant part:

SECTION III:  Authority

As provided by the terms of the Federal Grant and Cooperative Agreement Act of 1977 (FGCAA), 31 U.S.C. §6301, as amended, the grant awarded establishes a Cooperative Agreement between the Office of Refugee Resettlement (ORR) and BCFS HHS.  Pursuant to the FGCAA, this cooperative agreement (hereinafter "agreement") provides for substantial involvement and collaboration of ORR in activities related to cooperative agreements for residential services.

Exhibit 21 at 3-4.

**Imminent And Foreseeable Irreparable Harm To BCFS HHS**

81.     HHS's late 2020 and early 2021 decision to retroactively insert wage determinations a year after the period of performance for 90ZU0224 will cause imminent and irreparable harm to BCFS HHS.  As discussed above, the presumptive penalty for SCA

HB: 4848-3763-8900.9

noncompliance is debarment.  Debarment and/or threat of debarment of BCFS HHS – which receives the overwhelming majority of its revenue from federal, state and local governments - constitutes irreparable harm.

82.     On top of the foregoing, HHS has indicated to BCFS HHS that the funding for 90ZU0224 has ended or been discontinued.  *See* Exhibit 25 (NOA 90ZU0224-03-05 issued March 22, 2021 - "This action represents a de-obligation in the amount of $4,013,501 of unobligated funds.").  Hence, even if the SCA could apply to 90ZU0224, HHS lacks the funds to compensate BCFS HHS for any retroactive SCA jurisdiction.  Any attempt by HHS to retroactively fund BCFS HHS would likely violate the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A).  Therefore, HHS is legally barred from providing BCFS HHS with any funds that could be necessary to reimburse BCFS HHS or its vendors/subcontractors for retroactive SCA jurisdiction.  As a result of HHS's untimely decision to seek retroactive application of the SCA and HHS's lack of funds with which to compensate BCFS HHS for any retroactive application of the SCA, BCFS HHS is left without a remedy as a result of an SCA jurisdictional problem of HHS's and DOL's own creation.

83.     At the July 1, 2021 Zoom meeting and at other times, officials from HHS admitted to BCFS HHS that there is no funding available to provide BCFS HHS with payments to the extent BCFS HHS's (or its vendors/subcontractors') labor costs were to increase as a result of SCA jurisdiction.  HHS has explained that the funding for 90ZU0224 has lapsed and there are no more funds available.

84.     At the July 1, 2021 Zoom meeting and at other times, officials from HHS have admitted to BCFS HHS that HHS is running out of funding for FY2021 migrant shelter operations and may not have sufficient funds to cover all such operations.

85.     In the absence of available funds, and by virtue of the Anti-Deficiency Act preventing HHS from providing additional funds to BCFS HHS in the event the SCA actually applies to cooperative agreements, BCFS HHS will be irreparably harmed if the SCA is applied retroactively because BCFS HHS is not – and legally cannot be - compensated by HHS for any additional labor costs incurred by it or its vendors/subcontractors.

86.     BCFS HHS will also be irreparably harmed if the SCA is applied prospectively in connection with Carrizo Springs or any other future operations.  BCFS HHS will never be able to recoup the added administrative costs of compliance with the SCA in connection with any of its current or future cooperative agreements – because the SCA is a statute that does not even apply to cooperative agreements and does not provide for recovery of the administrative and compliance costs BCFS HHS has expended and will expend in the future to comply with the SCA – a statute that does not even apply to cooperative agreements.

87.     BCFS HHS will also be irreparably harmed by DOL's current and any future enforcement of the SCA in connection with any of BCFS HHS's cooperative agreements with HHS.  The SCA simply does not apply to HHS cooperative agreements.  There is no mechanism for BCFS HHS to recoup the costs of responding to a DOL investigation involving the SCA – a statute that does not apply to cooperative agreements.

### "Final" Agency Action

88.     The July 1, 2021 (and other) determinations in which both Defendant Looman and ORR Director Huang personally participated and ordered the applicability of the SCA to BCFS HHS's cooperative agreements with HHS are "deliberative determination[s] of the agency's position at the highest available level on a question of importance."  These determinations mark the consummation of the agency's decision-making process as indicated by

the participation of high-level agency officials.  Furthermore, these determinations are not of a tentative nature but rather are the culmination of a process that began as early as 2014.

89.     The decisions/orders of DOL and HHS that are the subject of this complaint indicate an agency-wide policy shift and as such are "final agency actions." The attempted expansion of the SCA's jurisdiction to cooperative agreements has widespread ramifications and would dictate new legal consequences.

90.     The decisions/orders of HHS that are the subject of this complaint are "final agency actions" because such decisions/order to include SCA clauses and wage determinations in cooperative agreements are not appealable to the HHS Departmental Appeals Board or any other HHS internal review process.

91.     The decisions/orders of DOL and HHS that are the subject of this complaint are "final agency actions" within the meaning of 5 U.S.C. § 704 because, among other reasons, neither DOL nor HHS requires by rule or provides that its decision to improperly apply the SCA beyond its plain language to cooperative agreements "is inoperative" pending appeal to superior agency authority.

92.     There is no internal administrative appeal process for HHS's decision to add SCA clauses and wage determinations to its cooperative agreements.  The HHS Departmental Appeals Board has no jurisdiction to review such decisions.  Hence, HHS's actions related to SCA jurisdiction as discussed in this complaint are "final agency actions" subject to APA review.

93.     Even if not deemed "final agency action," judicial review of DOL's 2014 through 2019 determinations/orders and more recent 2021 determinations (including the July 2021 determination by Defendant Looman) that cooperative agreements fall within the jurisdiction of the SCA is proper "because the agency's challenged action is so contrary to the [unambiguous

27

and mandatory provisions] of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute." *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997) (citing *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)).

94.    Similarly, even if not deemed "final agency action," judicial review of HHS's 2020 and 2021 determinations (and prior attempts) to include the SCA in cooperative agreements and related notices of awards despite the plain language of the SCA, the SCA's legislative history, the plain language of the FGCAA, and DOL's SCA regulations is proper "because the agency's challenged action is so contrary to the [unambiguous and mandatory provisions] of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute." *Kirby*, 109 F.3d at 269.

95.    DOL's and HHS's egregious disregard for the plain language of the SCA and the FGCAA and related regulations, combined with the severe and mandatory statutory debarment penalty facing BCFS HHS for non-compliance with the SCA, will wholly deprive BCFS HHS of a meaningful and adequate means of vindicating its rights if BCFS HHS is forced to wait years – after HHS adds the SCA clause to all of BCFS HHS's cooperative agreements and DOL brings enforcement proceedings related to some or all of such cooperative agreements - to challenge basic jurisdictional issues.

## Count I

**Violation Of The Administrative Procedure Act, Service Contract Act, Federal Grants And Cooperative Agreements Act, DOL's Implementing Regulations, And HHS's Award Regulations**

96.    The foregoing paragraphs 1 through 95 are incorporated by reference as if fully stated herein.

HB: 4848-3763-8900.9

97.     Under the Administrative Procedure Act ("APA"), a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

98.     The decisions and/or orders of each of DOL and HHS as described above must be set aside and held unlawful as "arbitrary, capricious, and abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" for a variety of reasons, including but not limited to the reasons set forth below.

**SCA Plain Language Does Not Cover Cooperative Agreements**

99.     By its plain language, the SCA "applies to any contract or bid specification for a contract, whether negotiated or advertised."  41 U.S.C. § 6702(a).  The SCA does not explicitly define what a "contract" is.  The language Congress chose, however, is clearly reflective of the commonly used language in federal procurement contracts.

100.     The plain language of § 6702(a) – "any contract or bid specification for a contract, whether negotiated or advertised" – and Congress's intent to limit it to traditional procurement contracts is confirmed when one reviews the § 6702(b) exemptions from SCA jurisdiction, each a kind of procurement contract.  *See* 29 U.S.C. § 6702(b) (exempting contracts for construction, carriage of freight, public utility services).

101.     The plain language of the SCA makes no mention of grants or cooperative agreements or any other kind of "contract-like" relationship between the federal government and any third parties.  Instead, by using the phrase "contract or bid specification for a contract,"

Congress clearly signaled that the SCA was intended to apply only to traditional procurement contracts.

### SCA Legislative History

102.     The legislative history of the SCA removes all doubt that the SCA was intended to apply only to procurement contracts and not cooperative agreements.

103.     In Senate Report 798, the Senate Committee on Labor and Public Welfare explained the purpose of the SCA as follows:

> The purpose of this bill is to provide labor standards for the protection of employees of contractors and subcontractors furnishing services to or performing maintenance service for Federal agencies. **The service contract is the only remaining category of Federal contracts to which no labor standards protection   applies.  Federal construction contracts require compliance with labor standards under the Davis-Bacon Act and related statutes.  Federal supply contracts also provide labor standards under the Walsh-Healey Public Contracts Act**.

S. REP. No. 89-798 at 1 (1965) (emphasis added).

104.     Similarly, in House Committee Report 948, the House Committee on Education and Labor echoed the Senate's explanation (H.R. REP. 89-948 at 1 (1965)) and added the following:

> The bill is applicable to advertised or negotiated contracts, in excess of $2,500, the principal purpose of which is for the furnishing of services through the use of service employees, as defined in the bill.  Thus, for example, contracts made by the District of Columbia government with local hospitals for the care of indigent patients would not be covered, since "service employees" as defined in the bill would be performing only incidental functions.  Similarly, contracts entered into by the Atomic Energy Commission for the management and operation of Government-owned plants would not be service contracts within the meaning of the bill.

H.R. REP 89-948 at 3 (1965).

105.     In both the House Report and the Senate Report there is no mention of cooperative agreements or any other kind of "contracts" other than procurement contracts for

30

construction services or supplies which are covered by the Davis Bacon Act and the Walsh

Healey Act, respectively.  Hence, from context, it is clear that Congress only intended the SCA

to apply to procurement contracts and not cooperative agreements, grants or any other

relationship between the federal government and providers other than through procurement

contracts.

### According To The Federal Grants And Cooperative Agreements Act, A Cooperative Agreement Is Not The Same Thing As A Procurement Contract

106.     Congress has determined that a Cooperative Agreement is not the same thing as a

procurement contract.  The Federal Grant and Cooperative Agreements Act ("FGCAA")

carefully defines three distinct legal forms federal agencies may use to acquire property and

services in support of federal missions and objectives: procurement contracts, 31 U.S.C. § 6303,

grants, 31 U.S.C. § 6304, and cooperative agreements, 31 U.S.C. § 6305.

107.     The FGCAA explains when agencies may use "procurement contracts" as

follows:

> An executive agency shall use a procurement contract as the legal instrument
> reflecting a relationship between the United States Government and a State, a
> local government, or other recipient when--
>
> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or
> barter) property or services for the direct benefit or use of the United States
> Government; or
>
> (2) the agency decides in a specific instance that the use of a procurement contract
> is appropriate

31 U.S.C. § 6303.

108.     The FGCAA's use of the term "procurement contract" comports with the Office

of Federal Procurement Policy statutory definition of "procurement" in 41 U.S.C. § 111 ("the

term 'procurement' includes all stages of the process of *acquiring property or services*,

beginning with the process for determining a need for property or services and ending with

contract completion and closeout") (emphasis added).  In both the FGCAA and OFPP statutes,

the focus is on the federal government acquiring property or services.

109.    The FGCAA explains when agencies may use "grants" as follows:

An executive agency shall use a grant agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--

(1) the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

(2) substantial involvement is not expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6304.

110.    Finally, the FGCAA explains when agencies may use "cooperative agreements"

as follows:

An executive agency shall use a cooperative agreement as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient when--

(1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States ***instead of acquiring*** (by purchase, lease, or barter) ***property or services for the direct benefit or use of the United States Government***; and

(2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

31 U.S.C. § 6305 (emphasis added).

111.    As the plain language of the FGCAA makes clear, federal agencies only use

cooperative agreements to carry out a public purpose when such federal agencies ***do not intend***

***to acquire property or services***.

112.    The FGCAA is a federal statute of general applicability and not entrusted to either

DOL or HHS for interpretation.  Hence, neither DOL nor HHS are entitled to any deference

concerning their purported interpretations of the FGCAA or the meaning of the terms

"cooperative agreement" or "procurement contract."

113.    On their face, both 90ZU0224 and 90ZU0334 are grants and/or cooperative

agreements under the express authority of the FGCAA.  Neither is a procurement contract as

defined by the FGCAA.

### HHS Issued Cooperative Agreements Are Not "Contracts"

114.    As discussed above, each of the cooperative agreements and related notices of

award at issue in this case were issued pursuant and remain subject to 45 C.F.R. Part 75.

115.    Pursuant to 45 C.F.R. § 75.2, a "Cooperative agreement"

means a legal instrument of financial assistance between a Federal awarding
agency or pass-through entity and a non-Federal entity that, consistent with 31
U.S.C. 6302-6305:

(1) Is used to enter into a relationship the principal purpose of which is to transfer
anything of value from the Federal awarding agency or pass-through entity to the
non-Federal entity to carry out a public purpose authorized by a law of the United
States (see 31 U.S.C. 6101(3)); and not to acquire property or services for the
Federal Government or pass-through entity's direct benefit or use;

116.    Also, pursuant to 45 C.F.R. § 75.2, a "Contract" means

a legal instrument by which a non-Federal entity purchases property or services
needed to carry out the project or program under a Federal award. The term as
used in this part does not include a legal instrument, even if the non-Federal entity
considers it a contract, when the substance of the transaction meets the definition
of a Federal award or subaward (see Subaward)

117.    Hence, according to the plain language of 45 C.F.R. § 75.2, a "cooperative

agreement" is not a "contract."  Instead "cooperative agreements" are a form of "Federal

Award", defined in 45 C.F.R. § 75.2 as:

(1)(i) The Federal financial assistance that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity, as described in §75.101; or

(ii) The cost-reimbursement contract under the Federal Acquisition Regulations that a non-Federal entity receives directly from a Federal awarding agency or indirectly from a pass-through entity, as described in §75.101.

(2) The instrument setting forth the terms and conditions. The instrument is the grant agreement, cooperative agreement, other agreement for assistance covered in paragraph (2) of Federal financial assistance, or the cost-reimbursement contract awarded under the Federal Acquisition Regulations.

(3) Federal award does not include other contracts that a Federal agency uses to buy goods or services from a contractor or a contract to operate Federal Government owned, contractor operated facilities (GOCOs).

118.     Because neither 90ZU0224 nor 90ZU0334 or any of their related Notices of Awards are a "contract awarded under the Federal Acquisition Regulations", neither cooperative agreement is a "contract."

119.     In this case, HHS expressly chose to award BCFS HHS "cooperative agreements", and not "contracts" pursuant to 45 C.F.R. § 75.201(a) ("The HHS awarding agency or pass-through entity must decide on the appropriate instrument for the Federal award (i.e., grant agreement, cooperative agreement, or contract) in accordance with the Federal Grant and Cooperative Agreement Act (31 U.S.C. §§ 6301-08).").

120.     DOL has no authority under either the FGCAA or 45 C.F.R. Part 75 and may not second guess HHS's explicit choice of a cooperative agreement as the appropriate funding vehicle (as opposed to awarding a contract) in its awards to BCFS HHS.

**Additional Authority For Why Cooperative Agreements Are Not "Contracts"**

121.     The Federal Acquisition Regulations – which apply to "procurement contracts" and federal agency procurement activities – further support the conclusion that the SCA jurisdiction cannot extend to cooperative agreements.  Specifically, 48 C.F.R. § 2.101 states that

*"Contracts do not include grants and cooperative agreements covered by 31 U.S.C. 6301, et seq."* (emphasis added).  Hence, cooperative agreements are not covered by the Federal Acquisition Regulations, nor would any of the FAR clauses related to SCA jurisdiction, *e.g.*, 48 C.F.R. § 52.222-41 (which largely mirrors 29 C.F.R. § 4.6), apply to cooperative agreements.

122.    The conclusion that a cooperative agreement cannot be a "procurement contract" is further supported because there is no 41 U.S.C. § 2101(1) "contracting officer" associated with cooperative agreements.  Instead, cooperative agreements have Grant Management Officers (OPM Series 1109), who are appointed and receive warrants under authority separate from Title 41 contracting officers (OPM Series 1102).

123.    Both 90ZU0224 and 90ZU0334 are issued pursuant to and/or subject to 45 C.F.R. Part 75 and 2 C.F.R. Part 180.

124.    45 C.F.R. § 75.2 defines a "cooperative agreement" as:

a legal instrument of financial assistance between a Federal awarding agency or pass-through entity and a non–Federal entity that, consistent with 31 U.S.C. 6302–6305:

(1) Is used to enter into a relationship the principal purpose of which is to transfer anything of value from the Federal awarding agency or pass-through entity to the non–Federal entity to carry out a public purpose authorized by a law of the United States (see 31 U.S.C. 6101(3)); and not to acquire property or services for the Federal Government or pass-through entity's direct benefit or use;

(2) Is distinguished from a grant in that it provides for substantial involvement between the Federal awarding agency or pass-through entity and the non–Federal entity in carrying out the activity contemplated by the Federal award.

The generally applicable OMB Uniform Guidance has a substantially similar definition of "cooperative agreement."  2 C.F.R. § 200.1; *cf*. 32 C.F.R. § 21.640 (Dept. of Defense).

125.    Similarly, the Uniform Guidance – the set of regulations generally applicable to federal agency financial assistance vehicles – specifically defines a "Nonprocurement transaction" to mean "any transaction, regardless of type (except procurement contracts),

including, but not limited to the following . . . Grants [and] Cooperative agreements."  2 C.F.R. §

180.970(a)(1) and (2); *cf., e.g*., 32 C.F.R. § 21.665 (Dept. of Defense); 2 C.F.R. § 417.970 (Dept.

of Interior); 2 C.F.R. § 1326.970 (Dept. of Commerce).

### The Legislative History Of Both The SCA And FGCAA Demonstrate That Congress Never Intended The SCA To Apply To Cooperative Agreements

126.    The SCA was first enacted by Congress in 1965.  The SCA remained essentially

unchanged until 2011, when Congress amended and recodified the statute.  *See* Service Contract

Act, Pub. L. No. 111-350 (2011).

127.    The FGCAA was passed in 1978 and updated in 1982 to bring some clarity as to

the three types of relationships third parties could have with the government: grants, cooperative

agreements, and procurement contracts.  *See* Act of Sept. 13, 1982, Pub. L. No 97-258 96 Stat.

1004 (1982).

128.    When Congress amended the SCA in 2011, Congress is presumed to have had full

knowledge of the previously enacted FGCAA and Office of Federal Procurement Policy

statutory schemes and the definitions contained therein.  *See, e.g., Miles v. Apex Marine Corp.,*

498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes

legislation.")(citing *Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1979)); *Chamber of*

*Commerce of United States of America v. U.S. Dept. of Labor*, 885 F.3d 360, 373 (5th Cir. 2018)

("Congress is presumed to have acted against a background of shared understanding of the terms

it uses in statutes.").

129.    In 2011, Congress amended what is now currently codified as 41 U.S.C. §

6702(a) to significantly change the wording from the 1965 version of the SCA.  The 2011

version of Section 6702(a) only refers to "any contract."  Notably absent from the 2011

amendments to SCA was any attempt by Congress to expand the jurisdiction of the SCA from just procurement "contracts" to include either grants or cooperative agreements, as defined by the FGCAA.

130.    Given Congress' decision to use only the word "contract" in the 2011 rewrite of the SCA and not expressly include "cooperative agreements" or provide any definition in the SCA regarding the term "contract" which DOL could exercise its discretion to interpret to cover cooperative agreements, it is clear that Congress intended the SCA to apply only to procurement "contracts" and not to "cooperative agreements" in conformity with the previously enacted FGCAA and Office of Federal Procurement Policy statutory schemes and the definitions contained therein.

### DOL's Own SCA Implementing Regulations Make Clear That DOL Defines SCA Jurisdiction As Being Limited To Procurement Contracts

131.    DOL's own regulations interpreting the SCA are principally focused on defining "contracts" as "procurement contracts."  Specifically, in 29 C.F.R. § 4.1a(e), the term "contract" has a circular definition that "includes any contract subject wholly or in part to the provisions of the Service Contract Act of 1965 as amended, and any subcontract of any tier thereunder. (See 4.10–4.134.)."  DOL's subsequent regulation concerning "What contracts are covered" states "[t]he Act covers service contracts of the Federal agencies described in 4.107–4.108." 29 C.F.R. § 4.110.  Section 4.107 states:

(a) Section 2(a) of the Act covers contracts (and any bid specification therefor) "entered into by the United States" and section 2(b) applies to contracts entered into "with the Federal Government." Within the meaning of these provisions, contracts entered into by the United States and contracts with the Federal Government include generally all contracts to which any agency or instrumentality of the U.S. Government becomes a party pursuant to authority derived from the Constitution and laws of the United States. . . .

(b) Where a Federal agency exercises its contracting authority to **procure** services desired by the Government, the method of **procurement** utilized by the

HB: 4848-3763-8900.9

> contracting agency is not controlling in determining coverage of the contract as
> one entered into by the United States. Such contracts may be entered into by the
> United States either through a direct award by a Federal agency or through the
> exercise by another agency (whether governmental or private) of authority
> granted to it to **procure** services for or on behalf of a Federal agency. . . .

29 C.F.R. § 4.107 (emphasis added).  DOL's repeated use of the terms "procure" and

"procurement" underscore that DOL intended to limit the SCA's jurisdiction to "procurement

contracts."  This makes sense as there are only "bid specifications" for "procurement contracts"

and not cooperative agreements or grants.

132.    Further demonstrating that the SCA was only intended to cover procurement

contracts is DOL's repeated use of the term "contracting officer" in its own SCA regulations.

Neither the SCA nor DOL's regulations interpreting the SCA define the term "contracting

officer," yet, DOL uses the procurement term of art "contracting officer" repeatedly.  *See, e.g.*,

29 C.F.R. §§ 4.1a(j); 4.1b(b); 4.3(e); 4.4(c); 4.6(b); 4.6(g); 4.6(i); 4.6(l); 4.51(a); 4.113(a);

4.116(c); 4.123(b); 4.123(e); 4.142(a); 4.144; 4.163(b); 4.187(a).

133.    DOL's use of the term "contracting officer" necessarily refers to the 41 U.S.C. §

2101(1) statutory definition of the term "contracting officer" which "means an individual who,

by appointment in accordance with applicable regulations, has the authority to enter into a

Federal agency ***procurement contract*** on behalf of the Government and to make determinations

and findings with respect to the contract." 41 U.S.C. § 2101(1) (emphasis added).  *See also* 48

C.F.R. § 2.101 (definition of "contracting officer"); 48 C.F.R. § 2.101 (defining a "contract" as

expressly excluding "cooperative agreements").

**Comparisons To Other DOL Regulatory Schemes Clearly Demonstrate That The SCA
Was Never Intended To Cover Cooperative Agreements**

134.    The limitation of the SCA to "procurement contracts" – and not "cooperative

agreements" - is underscored by plain language of Executive Order 13658 and 13706 explaining

that the federal minimum wage and paid sick leave requirements apply to "contracts" as well as "contract-like instruments."  Had the SCA and/or the Davis Bacon Act been historically interpreted by DOL to include "cooperative agreements", there would have been no need for these Executive Orders to expand the jurisdiction of federal minimum wage and paid sick to leave to cooperative agreements and other "contract-like instruments."

135.    DOL promulgated regulations implementing these Executive Orders with language that unequivocally expanded jurisdiction of the federal minimum wage and paid sick leave to cooperative agreements.  *See* 29 C.F.R. §§ 10.2 and 13.2.

136.    In the recently issued Executive Order 14026 on April 27, 2021 (Exec. Order No. 14026, 86 Fed. Reg. 22,835 (April 27, 2021)) and DOL's proposed regulations at 29 C.F.R. Part 23 issued on July 22, 2021 (Increasing the Minimum Wage for Federal Contractors, 86 Fed. Reg. 38,816 (proposed July 22, 2021) (to be codified at 29 C.F.R. pt. 10 and 23)), both the White House and the DOL once again expressed clear expansion of the term "contract" to include "contract like instruments" such as cooperative agreements.  This demonstrates, once again, that DOL knows how and is fully capable of promulgating regulations defining what constitutes a "contract" – to include cooperative agreements - when it wants to.

137.    To date, DOL has never amended its SCA regulations to expressly expand SCA jurisdiction to "contract-like instruments" generally or "cooperative agreements" specifically to match the expansion found in other DOL regulations such as 29 C.F.R. Parts 10, 13, and 23.  *See* 29 C.F.R. Part 4.  This further reinforces the notion that the SCA, as confirmed by DOL's own regulations, only applies to "procurement contracts" and not "contract-like instruments" or "cooperative agreements."

**DOL Does Not Apply The SCA To Its Own Cooperative Agreements So Why Should The SCA Apply To The Cooperative Agreements At Issue In This Case**

138.    It is hypocritical for DOL to insist that the SCA applies to BCFS HHS's cooperative agreements when DOL itself has not incorporated SCA clauses in any of the eighty-three (83) Funding Opportunity Announcements it issued agency wide from 2013 through June 2021.  *See, e.g*., U.S. DEPT. OF LABOR, ETA Funding Opportunity Announcement for RA and TA Centers of Excellence,  (https://www.dol.gov/sites/dolgov/files/ETA/grants/FOA-ETA-21-06.pdf; U.S. DEPT. OF LABOR, ETA Funding Opportunity Announcement for Veterans Accelerated Learning for Licensed Occupations Project, https://www.dol.gov/sites/dolgov/files/ETA/grants/pdfs/FOA-ETA-18-07.pdf; and U.S. DEPT. OF LABOR, ETA Funding Opportunity Announcement for Veterans Accelerated Learning for Licensed Occupations Project, https://www.dol.gov/sites/dolgov/files/ETA/grants/pdfs/FOA-ETA-19-06.pdf.

139.    DOL's failure/refusal to include SCA clauses in its own cooperative agreements is strong evidence that DOL, itself, does not consider "cooperative agreements" to be "contracts" subject to SCA jurisdiction.  DOL clearly does not "practice what it preaches" when it comes to SCA jurisdiction.

**The U.S. Department Of Justice Also Does Not Include SCA Clauses In Its Cooperative Agreements**

140.    In addition to having cooperative agreements with HHS/ORR, BCFS HHS also has cooperative agreements with the U.S. Department of Justice.

141.    Among those cooperative agreement, is Award Number 2020-CV-FX-K001 to fund a "regional violence prevention and response program in the Texas Rio Grande Valley"

related to Office of Justice Programs funding opportunity entitled "OJJDP FY20 Strategies to

Support Children Exposed to Violence." *See* Exhibit 22.

142.    According to the plain language of the Grant Manager's Project Summary for this

cooperative agreement:

> Funding under the Strategies to Support Children Exposed to Violence can be used to develop support services for children exposed to violence in their homes, schools, and communities; and to develop, enhance, and implement violent crime reduction strategies that focus on violent juvenile offenders. . . . .
>
> BCFS Health and Human Services (HHS) proposes Rio Grande Valley (RGV) Protects, a community collaborative to prevent violent crime, coordinate intervention, and hold offenders accountable in Cameron, Hidalgo, and Starr Counties in the Texas Rio Grande Valley. RGV Protects will target three populations: (1) youth survivors of gang violence and their families, (2) middle school students and their families, and (3) the general public.
>
> The three primary goals of the project are:(1) Accountability: Reduce violence through accountability for juvenile offenders; (2) Victim Response: Coordinate and enhance victim services; (3) Prevent juvenile violence, delinquency, and victimization. RGV Protects will develop and coordinate a regional planning team, which will conduct and respond to a regional needs assessment, develop regional care coordination and data-sharing protocols, and participate in training to enhance the cooperation between service providers and law enforcement. In addition, it will operate direct services for youth survivors of gang violence. . . .
>
> BCFS HHS has secured formalized partnerships with 14 law enforcement, victim service, education, mental and medical health, and juvenile justice agencies from across the region for this project, each of whom will sit on the planning team. Anticipated deliverables include 40 child survivors of gang violence served, 300 students provided prevention education, 1,500 collective hours of partner training, care coordination protocols, a regional needs assessment and action plan, and baseline and post intervention measures completed in communities and schools.

Exhibit 22 at 20-21.

143.    Despite the foregoing plain language of the cooperative agreement clearly

requiring BCFS HHS to provide "services," the SCA is not mentioned anywhere in this

cooperative agreement.

41

**Defendants Violated The APA**

144.    In light of the foregoing, and for additional reasons not expressly stated above, DOL's insistence that the SCA applies to cooperative agreements - a final decision/order it reached back in 2014 (but held semi-secret, and never communicated publicly, long before any SCA clauses or wage determinations were actually included in any BCFS HHS cooperative agreements at issue in this case and reaffirmed by the Acting Wage and Hour Administrator in the July 1, 2021 meeting between BCFS HHS and defendants) - is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

145.    In light of the foregoing, and for additional reasons not expressly stated above, DOL's current investigation of BCFS HHS related to cooperative agreement 90ZU0224 based on SCA clauses and wage determinations added by HHS nearly a year after the end of the period of performance for such cooperative agreement, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

146.    In light of the foregoing, and for additional reasons not expressly stated above, HHS's decision to include any reference to the Service Contract Act or any DOL SCA clauses or any wage determinations in cooperative agreements 90ZU0224 and 90ZU0334 through Notices of Award dated December 27-28, 2020, March 31, 2021, April 16, 2021, and July 12, 2021 is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

147.    In light of the foregoing, and for additional reasons not expressly stated above, HHS's decision to include any reference to the Service Contract Act or any DOL SCA clauses or any wage determinations in cooperative agreements 90ZU0224 through Notices of Award dated December 27-28, 2020, March 31, 2021, April 16, 2021, is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" 5 U.S.C. § 706(2) and should be stricken and declared void ab initio.

148.    Because each of the decisions/orders of DOL and HHS discussed above are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and/or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," each such decision/order must be set aside, declared unlawful, and enjoined, as a matter of law.

### Prayer For Relief

WHEREFORE, Plaintiff petitions this Court to review and set aside the aforementioned decisions/orders of the U.S. Department of Labor and the U.S. Department of Health and Human Services concerning the alleged jurisdiction of the Service Contract Act as extending to BCFS HHS's cooperative agreements 90ZU0224 and 90ZU0334 as violative of the Administrative Procedure Act and Service Contract Act and:

1.    Declare and enter judgment that the Service Contract Act does not apply, as a matter of law, to cooperative agreements issued by HHS pursuant to the Federal Grants and Cooperative Agreements Act and set aside any decision, policy, or action by the U.S. Department of Labor and/or the U.S. Department of Health and Human Services to the contrary pursuant to 5 U.S.C. § 706;

2.      Declare and enter judgment that the Service Contract Act clauses and wage determinations that the U.S. Department of Health and Human Services included in Notice of Award 90ZU0334-02-04 and subsequent Notices of Award related to Cooperative Agreement 90ZU0334 and continuing operations at the Carrizo Springs facility are void *ab initio* because the jurisdiction of the Service Contract Act does not extend to cooperative agreements;

3.      Declare and enter judgment that the U.S. Department of Health and Human Services improperly added Service Contract Act related terms and conditions to Cooperative Agreement 90ZU0224 and related Notices of Award nearly a year after the period of performance for that Cooperative Agreement ended are void *ab initio* because the jurisdiction of the Service Contract Act does not extend to cooperative agreements;

4.      Issue a preliminary and permanent injunction enjoining the U.S. Department of Labor from applying or attempting to apply the Service Contract Act to any cooperative agreements issued by HHS pursuant to the Federal Grants and Cooperative Agreements Act because the jurisdiction of the Service Contract Act does not extend to cooperative agreements;;

5.      Issue a preliminary and permanent injunction enjoining Defendants from enforcing any Service Contract Act provisions placed in any U.S. Department of Health and Human Services Cooperative Agreements issued pursuant to the Federal Grants and Cooperative Agreements Act because the jurisdiction of the Service Contract Act does not extend to cooperative agreements;

6.      Order the U.S. Department of Health and Human Services to immediately remove any and all Service Contract Act provisions and accompanying wage determinations from all Cooperative Agreements issued pursuant to the Federal Grants and Cooperative Agreements Act by HHS or any component thereof;

44

7.      Award Plaintiff attorneys' fees to the extent permitted by law; and

8.      Grant Plaintiff any such other further relief as this Court deems proper.

DATED:  August 18, 2021

                                  Respectfully submitted,

Michael J. Schrier (D.C. Bar No. 444693;
*pro hac vice pending*)
Gregg N. Sofer (NY Bar No. 2496933;
*pro hac vice pending)*
HUSCH BLACKWELL LLP
750 17th Street, N.W., Suite 900
Washington, DC 20006-4675
Telephone: (202) 378-2313
michael.schrier@huschblackwell.com
gregg.Sofer@huschblackwell.com


*/s/ Thomas Watkins*
Thomas Watkins (TX Bar No. 20928000)
HUSCH BLACKWELL LLP
111 Congress Avenue, Suite 1400
Austin, TX 78701-4093
Telephone: (512) 472-5456
tom.watkins@huschblackwell.com

*Counsel for Plaintiff BCFS Health and Human Services*

HB: 4848-3763-8900.9