## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

BCFS HEALTH AND HUMAN
SERVICES,

      *Plaintiff*,

v.                                **Case No. SA-21-CV-0776-JKP**

UNITED STATES DEPARTMENT
OF LABOR, et al.,

      *Defendants*.

## <u>MEMORANDUM OPINION AND ORDER</u>

In this complex case involving various federal statutes and accompanying jurisdictional issues, Plaintiff seeks declaratory and injunctive relief. The parties present their issues and arguments in three motions and related briefing: (1) *Plaintiff's Motion for Preliminary Injunction* (ECF No. 6), which the Court has converted to summary judgment, *see* ECF No. 23; (2) *Defendants' Motion to Dismiss or, in the alternative, Cross-Motion for Summary Judgment* (ECF No. 25), which is also Defendant's response to Plaintiff's motion (ECF No. 24); and (3) Plaintiff's Request for Oral Hearing (ECF No. 30). Both sides have submitted additional briefing and evidence.[1] After considering the motions, related briefing, relevant evidence, and the applicable law the Court finds that it lacks jurisdiction over this matter and thus grants the motion to dismiss while denying or mooting the other motions for reasons set forth herein.

## I. PROCEDURAL BACKGROUND

Plaintiff commenced this civil action against various federal agencies and officials

---

[1] Documents 24 and 25 are identical documents and represent Defendants' motion and response. Defendants have also filed an Appendix (ECF No. 26) in support of its motion and a response (ECF No. 31) to the request for hearing. Plaintiff has filed a reply (ECF No. 27) to Defendants' response and a response (ECF No. 28) to Defendants' motion – although filed twice the reply and response are identical, including attached evidentiary exhibits.

(hereinafter collectively referred to as "the Government") by filing a *Complaint for Preliminary Injunctive Relief and Declaratory Judgment [hereinafter Complaint]* (ECF No. 1) with twenty-five exhibits (ECF No. 1-1 to 1-25). That same day it filed a corrected Exhibit 21 (ECF No. 5) and its motion for preliminary injunction (ECF No. 6). According to Plaintiff:

> This case is the result of a seven year odyssey by the U.S. Department of Labor ("DOL") to grossly overstep its legal authority regarding another federal agency's grant system and the U.S. Department of Health and Human Services' ("HHS") decision to keep its providers in the dark regarding the conflict as to whether the jurisdiction of the Service Contract Act ("SCA"), a prevailing wage statute applicable to federal procurement contracts for services, extends to Cooperative Agreements issued by the Office of Refugee Resettlement ("ORR") pursuant to the Federal Grants and Cooperative Agreements Act ("FGCAA") for the establishment and operation of shelters for unaccompanied minor children. From 2014 through the end of 2020, HHS resisted DOL's insistence that the SCA's jurisdiction should extend to such shelters and did not take proper steps to make the SCA enforceable. Yet, a month after the 2020 presidential election, HHS changed course and half-heartedly began attempting to add SCA clauses and wage determinations to cooperative agreements in an inconsistent and incomplete manner. This legally unsupported expansion of SCA jurisdiction exposes all ORR providers to the potential threat of DOL investigations, significant financial penalties, and federal debarment. Notably, this self-inflicted-crisis also occurs against a backdrop of an unprecedented surge of unaccompanied minor children crossing the U.S. border; a global pandemic that spreads especially virulently in crowded conditions and has resulted in a severe shortage of provider staff; overtaxed and depleted ORR budgets; and a political environment super-charged with hostility around the topic of immigration that threatens the very existence of ORR shelters.

*See* Compl. ¶ 1.[2] Plaintiff invokes "jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq." *Id*. ¶ 14.

The Court set an initial briefing schedule on Plaintiff's motion, *see* ECF No. 10, and later extended that schedule to include the filing of a joint advisory, *see* ECF No. 18. Upon receipt of such advisory, the Court, pursuant to Fed. R. Civ. P. 65(a)(2), converted the motion to one seeking summary judgment and set a new briefing schedule. *See* ECF No. 23. The Court also stated: "If,

---

[2] The Court considered omitting politically charged and inflammatory language as unnecessary. It has instead left the paragraph as drafted by Plaintiff. Nevertheless, impassioned pleas intended to incite emotions or political loyalty have no place in pleadings or motion practice and do not sway neutral arbiters of the law. This Court and all courts endeavor to apply the law to a given set of facts without regard to politics or emotions.

after reviewing the completed briefing, the Court deems a hearing warranted, it will set the matter for hearing. And to the extent feasible, it will conduct the hearing via video or telephone as requested by the parties." *Id*.

In addition to various exhibits submitted with the complaint, the parties have submitted voluminous briefing on the motions including numerous exhibits. Having a complete record before it, the Court is prepared to rule. Based on the record before it, the Court concludes that it is unnecessary to hold a hearing and thus denies the request for oral hearing.

## II. STATUTORY AND REGULATORY BACKGROUND

In 1965, Congress enacted the McNamara-O'Hara Service Contract Act, 41 U.S.C. §§ 6701-07 ("SCA" or "Act") (formerly codified at 41 U.S.C. §§ 351-58), to protect the wage standards of employees furnishing services to or performing services for federal agencies. *See* McNamara-O'Hara Service Contract Act of 1965, Pub. L. No. 89-286, 79 Stat. 1034; *Lear Siegler Servs., Inc. v. Rumsfeld*, 457 F.3d 1262, 1266 (Fed. Cir. 2006); *Fort Hood Barbers Ass'n v. Herman*, 137 F.3d 302, 305 (5th Cir. 1998) (per curiam). Subject to various exceptions not relevant here, the Act, as amended in 2011,

> applies to any contract or bid specification for a contract, whether negotiated or advertised, that -- (1) is made by the Federal Government . . . (2) involves an amount exceeding $2,500; and (3) has as its principal purpose the furnishing of services in the United States through the use of service employees.

41 U.S.C. § 6702(a) (altering structure into one paragraph).

As recognized in *Fort Hood*, "the primary purpose of the Act was to protect wage standards of employees," and "[b]y requiring service contractors to pay their employees the prevailing wage rate, Congress sought to neutralize the federal government's inordinate purchasing power and its depressive effect on the market's natural resolution of wage and benefit rates." 137 F.3d at 309. Accordingly, "the SCA prevents contractors from underbidding each other (and hence being awarded government contracts) by cutting wages or fringe benefits to its service workers." *Lear*

3

*Siegler*, 457 F.3d at 1266.

"Congress granted the Secretary [of Labor] a wide girth of discretion with which to imple-ment the Act. If the regulation reasonably comports with the purposes of the Act and the amend-ments, it must be deemed valid." *Fort Hood*, 137 F.3d at 309. By statute, Congress granted the Secretary of Labor authority to implement and enforce the SCA in accordance with the adminis-trative and enforcement provisions of the Walsh-Healey Act, 41 U.S.C. §§ 6506-07. *See* 41 U.S.C. § 6707(a); 15A Fed. Procedure, Lawyer's Ed. § 39:321 (Mar. 2022 update) (noting that, through § 6707 "[t]he provisions of the Walsh-Healey Act regarding judicial review govern in proceedings under the Service Contract Act" and referencing §§ 6506-07). And the Secretary of Labor has promulgated regulations that provide a comprehensive administrative scheme for implementing and enforcing the Act's requirements. *See* 29 C.F.R. §§ 4.1 et seq., §§ 6.1 et seq., §§ 8.1 et seq.

By statute, covered contracts must contain specific terms, including provisions "specifying the minimum wage to be paid" and "the fringe benefits to be provided to each class of service employee engaged in the performance of the contract or any subcontract." 41 U.S.C. § 6703(1)-(2). And by regulation, they must also "contain, as an attachment, the applicable, currently effec-tive wage determination specifying the minimum wages and fringe benefits for service employees to be employed thereunder." 29 C.F.R. § 4.5. Further, they must include specific clauses set out by regulation. *See id.* § 4.6.

In accordance with the promulgated regulations, "[t]he Department of Labor (and not the contracting agencies) has the primary and final authority and responsibility for administering and interpreting the Act, including making determinations of coverage." *Id*. § 4.101(b) (citing various cases and "43 Atty. Gen, Ops. ___ (Mar. 9, 1979)"). The Supreme Court has recognized that 43 Op. Atty. Gen. No. 14 (1979) states: "Secretary has final authority to determine whether particular contracts are covered by Walsh-Healey or Service Contract Acts." *See Univs. Rsch. Ass'n, Inc. v.*

*Coutu*, 450 U.S. 754, 761 n.9 (1981).

"On matters which have not been authoritatively determined by the courts, it is necessary for the Secretary of Labor and the Administrator to reach conclusions as to the meaning and the application of provisions of the law in order to carry out their responsibilities of administration and enforcement." 29 C.F.R. § 4.101(c). Furthermore, being remedial in nature, the SCA

> is intended to be applied to a wide variety of contracts, and the Act does not define or limit the types of services which may be contracted for under a contract the principal purpose of which is to furnish services. Further, the nomenclature, type, or particular form of contract used by procurement agencies is not determinative of coverage. Whether the principal purpose of a particular contract is the furnishing of services through the use of service employees is largely a question to be determined on the basis of all the facts in each particular case.

29 C.F.R. § 4.111(a). That some coverage questions may not require a determination as to the SCA's applicability to a particular type or form of contract does not mean that the Secretary's authority to interpret the SCA and to make coverage decisions excludes applicability determinations. To the contrary, §§ 4.101(c) and 4.111(a) indicate that applicability determinations are within the final authority of the DOL or its authorized representative to determine whether the SCA covers particular contracts.

Regulations permit coverage determinations to be retroactively applied to a contract when the Secretary or his authorized designee determines that a federal agency erroneously concluded that the SCA did not apply to a particular contract. *See* 29 C.F.R. § 4.5(c). When changes to a contract are made, the contracting agency may exercise "any and all authority that may be needed (including where necessary, its authority to negotiate or amend, its authority to pay any necessary additional costs, and its authority under any contract provision authorizing changes, cancellation, and termination)." *Id*.

The regulations provide two avenues for disputing the applicability of the SCA. First, questions of "interpretation, practice, or enforcement policy" are to be directed to the Administrator of

the Wage and Hour Division [("WHD")], U.S. Department of Labor, Washington, DC 20210, or any regional office of the Wage and Hour Division." 29 C.F.R. § 4.101(g). Further, the Administrative Review Board ("ARB")

> has jurisdiction to hear and decide in its discretion appeals concerning questions of law and fact from final decisions of the Administrator of the Wage and Hour Division or authorized representative, and from decisions of Administrative Law Judges under subparts B, D, and E of part 6 of this title, arising under the Service Contract Act and the Contract Work Hours and Safety Standards Act where the contract is also subject to the Service Contract Act. The Board shall not have jurisdiction to pass on the validity of any portion of the Code of Federal Regulations which has been duly promulgated through notice and comment by the Department of Labor and shall observe the provisions thereof, where pertinent, in its decisions.

*Id*. § 8.1(b). This jurisdiction includes "final actions of the Wage-Hour Administrator or authorized representative," such as "rulings with respect to application of the [SCA]." *Id*. § 8.1(b)(6).

In Subparts A, B, C, and D of Part 8 of Subtitle A concerning the Office of the Secretary of Labor, the regulations set out the procedure for petitioning the ARB with respect to federal service contracts. *See id*. § 8.1 (Subpart A, purpose and scope); § 8.2 through § 8.6 (Subpart B, review of wage determinations); § 8.7 through § 8.9 (Subpart C, review of decisions in other proceedings); § 8.10 through § 8.18 (Subpart D, general procedural matters). An aggrieved party may "petition for review of a final written decision (other than a wage determination) of the Administrator or authorized representative." *Id*. § 8.7(b). Notably, on March 6, 2020, the Secretary of Labor "delegated authority and assigned responsibility" to the ARB "to act for the Secretary of Labor in review or on appeal" of listed matters, including:

> Final decisions of the Administrator of the Wage and Hour Division or an authorized representative of the Administrator, and final decisions of Administrative Law Judges ("ALJs"), under . . . [t]he McNamara-O'Hara Service Contract Act, as amended, 41 U.S.C. 6701 et seq.; the Contract Work Hours and Safety Standards Act, 40 U.S.C. 3701 et seq. (except matters pertaining to safety) where the contract is also subject to the McNamara-O'Hara Service Contract Act; and 29 CFR parts 4, 5, 6, subparts B, D, E.

*See* Dep't of Labor, Secretary's Order 01-2020—Delegation of Authority and Assignment of

6

Responsibility to the Administrative Review Board, 85 Fed. Reg. 13,186-01, 2020 WL 1065013, ¶ 5(a)(2) (Mar. 6, 2020) [hereinafter "Delegation of Authority"].

"Under the SCA, the Department of Labor's administrative determinations are judicially reviewable." *C&E Servs., Inc. of Wash. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002). But because "disputes arising under the SCA must be resolved, in the first instance, by 'the statutory scheme for administrative relief set forth by Congress in the SCA' and administered by the Department of Labor," district courts lack "authority to adjudicate . . . rights under the SCA except pursuant to the Administrative Procedure Act *following* a Department of Labor determination." *Id.* (quoting *Danielsen v. Burnside–Ott Aviation Training Ctr., Inc.*, 941 F.2d 1220, 1226 (D.C. Cir. 1991)).

As a second means to dispute the applicability of the SCA, a party may assert a defensive objection to the applicability of the SCA during administrative enforcement proceedings. By statute, "the Federal Government may bring action against the contractor, subcontractor, or any sureties" for certain violations of the SCA. *See* 41 U.S.C. § 6705(b). And enforcement to carry out the statute lies with "the Secretary or the head of a Federal agency" as set out in "regulations prescribed pursuant to section 6707(a)-(d)."

> The procedures for a contractor or subcontractor to dispute findings regarding violations of the Act, including back wage liability or the disposition of funds withheld by the agency for such liability, are contained in parts 6 and 8 of this title. Appeals in such matters have not been delegated to the contracting agencies and such matters cannot be appealed under the disputes clause in the contractor's contract.

29 C.F.R. § 4.187(f).

In general, when a contractor or subcontractor disputes alleged violations, enforcement proceedings begin with the filing of an administrative complaint before an administrative law judge ("ALJ") from DOL's Office of Administrative Law. *See* 29 C.F.R. § 6.15. The filing of the complaint prompts an answer from the respondent. *See id.* § 6.16. If the parties do not enter into

consent findings and an order disposing of the matter under § 6.18, the ALJ will issue a decision under § 6.19. Any aggrieved party who desires review of the ALJ decision may file a petition of review to the ARB, *see id*. § 6.20, which then invokes the provisions of 29 C.F.R. § 8.1 through 8.19. And as noted previously, the ARB's decision constitutes the DOL's final decision and, as such, is judicially reviewable.

Plaintiff has little disagreement with the above-stated background that was provided by the Government and supplemented and/or modified by the Court. It points out, however, that some statements of law are correct only to the extent that they involve a contract subject to the SCA. *See* ECF No. 27 at 7. It further disagrees that it is likely to be reimbursed under 29 C.F.R. § 4.5. *See id*. at 8. And finally, while it agrees that the DOL regulations generally provide two avenues for disputing the applicability of the SCA, "such administrative appeal procedures only apply to 'how' the SCA will be applied . . . and not 'whether' there is SCA jurisdiction in the first place." *Id*. To the extent necessary, the Court will address these matters in due course.

To fully understand Plaintiff's first point, one must recognize that Plaintiff contends that the cooperative agreements issued by HHS to Plaintiff pursuant to the Federal Grant and Cooperative Agreement Act, 31 U.S.C. §§ 6301-08, ("FGCAA") are not contracts subject to the SCA. *See* ECF No. 27 at 1. It presents a four-pronged merits attack on Defendants' actions asserting SCA jurisdiction over the cooperative agreements:

(1) Congress exclusively provided for SCA jurisdiction over "contracts" and expressly withheld SCA jurisdiction over "grants" when it passed the SCA in 1965;

(2) SCA jurisdiction has never extended to "grants";

(3) Congress expressly subdivided the pre-SCA legal concept of grants into "grants" and "cooperative agreements" when it passed the FGCAA in 1978; and

(4) Because FGCAA "cooperative agreements" are merely a subdivision of grants that were already excluded from SCA jurisdiction at the time of its passage, SCA jurisdiction cannot extend to FGCAA "cooperative agreements."

*Id*. Plaintiff concludes that "because Service Contract Act jurisdiction extends only to 'contracts'

and FGCAA 'cooperative agreements' are not 'contracts' . . . Plaintiff is entitled to summary judgment on its Administrative Procedure Act ("APA") claim, as a matter of law." *Id*. (footnote omitted).

Later in its response to Defendants' motion, Plaintiff further explains its four-pronged attack. *See* ECF No. 27 at 32-33, 36. It explains that "Congress, through the evolution of the 1958 Grants Act, the 1965 SCA, and the 1978 FGCAA, made clear that it never intended SCA jurisdiction to extend to grants or cooperative agreements." *Id*. at 32. It contends that (1) "Grants were never subject to SCA jurisdiction"; (2) "Cooperative agreements, by law, are simply a form of 'grant' that pre-existed the passage of the FGCAA and were given a new name as a result of the passage of the FGCAA"; and (3) "Hence, cooperative agreements are not and never were subject to SCA jurisdiction." *Id*.

In the Grants Act of 1958, Congress expressly provided federal agencies who otherwise had contract authority "where it is deemed to be in furtherance of the objectives of the agency [the authority] to make grants to such institutions or organizations for the support of such basic scientific research." Grants Act of 1958, Pub. L. No. 85-934, § 1, 72 Stat.1793 (1958) (repealed). Section 2 of the Grants Act gave "[a]uthority to make grants or contracts for the conduct of basic or applied scientific research" at specified nonprofit institutions or organizations. *See id*. § 2.

As the Grants Act was in place when Congress enacted the SCA, one may presume that Congress understood the distinction between contracts governed by the SCA versus grants governed by the Grants Act. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (noting that Supreme Court "assume[s] that Congress is aware of existing law when it passes legislation"). But there is no evidence that, even at that time, grants and contracts were mutually exclusive. And following passage of the SCA, Congress enacted the FGCAA in 1978. Plaintiff argues that a 1972 Report of the Commission on Government Procurement supports not applying the SCA to grants

or its subset, cooperative agreements. *See* ECF No. 27 at 33-36. Plaintiff further argues that the 1972 Report foreshadows a 1981 Report regarding providing better guidance to agencies regarding contracts, grants, and cooperative agreements. *See id*. at 34-35. Congress updated the FGCAA "in 1982 to bring some clarity as to the three types of relationships third parties could have with the government: grants, cooperative agreements, and procurement contracts." ECF No. 6 at 12 (citing Act of Sept. 13, 1982, Pub. L. No. 97-258 96 Stat. 1004 (1982)).

Under the FGCAA, executive agencies "shall use a procurement contract as the legal instrument reflecting a relationship between the United States Government and a State, a local government, or other recipient" in two instances:

> (1) the principal purpose of the instrument is to acquire (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; or

> (2) the agency decides in a specific instance that the use of a procurement contract is appropriate.

31 U.S.C. § 6303. They "shall use a grant agreement . . . when"

> (1) the principal purpose of the relationship is to transfer a thing of value to the State or local government or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

> (2) substantial involvement is not expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

Id. § 6304. And they "shall use a cooperative agreement . . . when"

> (1) the principal purpose of the relationship is to transfer a thing of value to the State, local government, or other recipient to carry out a public purpose of support or stimulation authorized by a law of the United States instead of acquiring (by purchase, lease, or barter) property or services for the direct benefit or use of the United States Government; and

> (2) substantial involvement is expected between the executive agency and the State, local government, or other recipient when carrying out the activity contemplated in the agreement.

*Id*. § 6305.

10

One law journal has noted that "[t]he FGCAA, as originally enacted, provided for three distinct funding instruments: grants, cooperative agreements, and contracts." Jeffrey C. Walker, *Enforcing Grants and Cooperative Agreements as Contracts Under the Tucker Act*, 26 Pub. Cont. L.J. 683, 700 (1997) (citing Pub. L. No. 95-224, §§ 4-6, 92 Stat. 3 (1978)). However, that same journal further recognized that "[s]ince 1982, the FGCAA has contrasted grants and cooperative agreements with procurement contracts and, thus, does not logically preclude grants and cooperative agreements from being contracts." *Id*. In the author's view, courts "should recognized that grants and cooperative agreements are capable of being valid contracts." *Id*. at 701.

While distinct from SCA matters, some aspects of the author's conclusion merit consideration:

> Grants and cooperative agreements must be used when the Government seeks to carry out a public purpose of support or stimulation rather than to acquire goods or services for the Government's own benefit. By statutory definition, grants and cooperative agreements are not procurement contracts and, therefore, are not governed by the statutory and regulatory superstructure that surrounds government procurement. . . .

> Although grants and cooperative agreements are not procurement contracts, they nonetheless can be contracts. Failure to recognize that not all contracts are procurement contracts has contributed to the confusion that grants and cooperative agreements are not contractual in nature. This oversight is caused, in part, by imprecise language in the FAR [(Federal Acquisition Regulation, 48 C.F.R. §§ 2.101, 35.003)], which employs the term "contract" loosely and interchangeably with the term "procurement contract," as did the FGCAA as originally enacted. The fact that grants and cooperative agreements are legally distinct from procurement contracts does not, however, preclude grants and cooperative agreements from being contracts. Instead, whether a grant or cooperative agreement is a valid contract must be determined by looking to common law principles of contract. Grants and cooperative agreements that exhibit the elements of offer, acceptance, consideration, and proper government authorization are valid contracts.

*Id*. at 707.

### III. OVERVIEW OF UNACCOMPANIED CHILDREN PROGRAM

Since 2003, the Office of Refugee Resettlement ("ORR") of the U.S. Department of Health and Human Services ("HHS") has been the agency responsible for the care and placement of

unaccompanied children who enter the United States without immigration status and without a parent or legal guardian who is able to provide for their physical and mental well-being. *See* HHS-ORR, Unaccompanied Children, https://www.acf.hhs.gov/orr/programs/uc (last visited Mar. 14, 2022). Through this Unaccompanied Children Program, most children are cared for through a network of state licensed, ORR-funded residential facilities until the children are released to a sponsor, obtain immigration legal relief, age out, or are discharged to HHS. *See* HHS-ORR, About the Program, https://www.acf.hhs.gov/orr/about (last visited Mar. 14, 2022); Cooperative Agreement (ECF No. 1-4 (unexecuted) and App'x 1-31 (executed)).

## IV. UNDISPUTED FACTS AND ALLEGATIONS

As alleged by Plaintiff, it entered into a series of cooperative agreements with HHS-ORR to provide temporary residential services for unaccompanied children beginning in 2012. *See* Compl. ¶¶ 30, 31, 46, 66, 74. On December 15, 2014, the Chief of DOL's Government Contracts Enforcement Branch sent a letter to HHS's Office of Grants and Acquisition Policy and Accountability to explain that as a result of a WHD investigation, WHD had determined that the 2012 cooperative agreement between HHS-ORR and Plaintiff contained the elements of a service contract subject to the SCA. *See* ECF No. 1-1. A letter dated February 8, 2019, sets out the HHS' ongoing dialog regarding the applicability of SCA to the cooperative agreements entered into by Plaintiff and references SCA provisions added to cooperative agreements commencing in 2016. *See* ECF No. 1-2. Subsequently, at the direction of WHD, HHS-ORR retroactively incorporated SCA clauses and wage determinations into Notices of Award related to cooperative agreements executed by Plaintiff . *See* ECF Nos. 1-2 through 1-13.

On or about April 27, 2021, an agency investigator informed Plaintiff that it was commencing an SCA compliance investigation pertaining to a cooperative agreement. Compl. ¶ 56. Plaintiff lodged objections to the retroactive amendment of the cooperative agreement by letter dated April

28, 2021. ECF No. 1-14. Plaintiff forwarded a copy of that letter to the agency investigator that same day. Compl. ¶ 57. By letter dated May 12, 2021, WHD provided Plaintiff formal notice of the SCA investigation and requested to inspect Plaintiff's records pursuant to 29 C.F.R. § 4.185. *See* ECF No. 1-15.

Through two letters in May 2021, Plaintiff objected to the WHD's determination that the SCA applied to the cooperative agreement. *See* ECF Nos. 1-16, 1-17. Plaintiff expressed a desire "that DOL creates a robust and fulsome administrative record for this matter," including "an appropriately detailed legal justification and explanation for DOL's SCA jurisdiction." ECF No. 1-17 at 3, 10. When Plaintiff filed its complaint on August 18, 2021, WHD had not provided a written response to Plaintiff's request for clarification regarding WHD's SCA applicability determination. *See* Compl. ¶ 61.

In mid-June 2021, HHS-ORR notified Plaintiff that it wanted Plaintiff to continue providing residential services to unaccompanied minor children at a facility located in Carrizo Springs, Texas. *See id*. ¶ 65. At that time, the Carrizo Springs facility was operating under Cooperative Agreement 90ZU0208, which had reached its maximum number of allowable extensions. *See id*. ¶¶ 66-67; App'x 36-66. HHS-ORR informed Plaintiff that, by July 12, 2021, it intended to transfer the Carrizo Springs operations to Cooperative Agreement 90ZU0334 and to insert SCA clauses and wage determinations in the Notice of Award. *See* Compl. ¶ 66.

Plaintiff objected to the inclusion of the SCA clauses and wage determinations in Cooperative Agreement 90ZU0334 and notified HHS-ORR that it would close the Carrizo Springs facility if the agency "insisted on SCA compliance on such short notice." *See id*. ¶ 70; App'x 67-68 (Letter from Sonya Thompson, Executive Director, Residential Services, BCFS to Jacqueline DePuy, Project Officer, HHS-ORR (June 19, 2021)); App'x 69-70 (Email from Kevin C. Dinnin, President & CEO, BCFS to DePuy (June 21, 2021)); App'x 71 (Email from Dinnin to DePuy (July 3, 2021)).

In an effort to reach an agreement on the closure possibility, HHS-ORR convened a videoconference with Plaintiff. Compl. ¶ 71. Among the participants were Jessica Looman, Acting Administrator, WHD and Cindy Huang, Director, HHS-ORR. *Id.*

Following that videoconference, Plaintiff, WHD, and HHS-ORR reached an agreement whereby Plaintiff, while preserving its objections to application of the SCA, agreed to comply with the requirements of the SCA with respect to a Notice of Award (90ZU0334-02-03) expected to issue on or about July 13, 2021, for the continued operation of the Carrizo Springs facility for a period of ninety (90) days and HHS-ORR agreed to provide additional funding, capped at approximately $10 million, to cover the increased operational expenses resulting from the inclusion of the SCA clauses in the Notice of Award. *See* ECF No. 1-19 (HHS-ORR and BCFS Agreement, July 4, 2021) at 9-10. Further, WHD agreed not to seek to enforce the SCA with respect to any wage or fringe benefit amounts that exceed the capped estimate of the additional funding HHS-ORR provided. *See* App'x 72-73 (Letter from Looman to Dinnin (July 3, 2021)).

This agreement did not end the disagreements and objections of Plaintiff. *See* ECF Nos. 1-20, 1-24. This litigation ensued soon thereafter.

## V. JURISDICTION

Pursuant to Fed. R. Civ. P. 12(b)(1), the Government seeks to dismiss this case for lack of jurisdiction under 5 U.S.C. §§ 702 and 704. ECF No. 24 at 12-13. More particularly, it argues that any agency action at issue is not final and that any coverage determination is not definitive. *See id.* at 12-19.

Although Plaintiff contends that Defendants' use of the term, "coverage," is legally incorrect, misstates the issue, "and suggests an attempt to deliberately recharacterize their purely legal determination in this case into a 'factual' one," ECF No. 27 at 14 n.10, Defendants do not dispute "that the question of the SCA's applicability to the Cooperative Agreements is legal in nature,"

14

ECF No. 29 at 5 n.4. The Court does not view the use of such term as legally incorrect or misstating the issue. Distinguishing between "coverage," "applicability," or "SCA jurisdiction" in this context is immaterial with respect to the issue of finality. As Defendants point out, "[a]n attack on the authority of an agency to conduct an investigation does not obviate the final agency action requirement." *Id.* at 6.n.4 (quoting *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)).

"'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'" *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). "Jurisdiction is essentially the authority conferred by Congress to decide a given type of case one way or the other." *Hagans v. Lavine*, 415 U.S. 528, 538 (1974). "A motion to dismiss contesting jurisdiction should be granted if the court lacks the statutory or constitutional power to adjudicate the case." *Hawkins v. Dep't of Hous. & Urb. Dev.*, 16 F.4th 147, 152 (5th Cir. 2021) (citation and internal quotation marks omitted). Courts "must presume that a suit lies outside this limited jurisdiction, and the burden of establishing federal jurisdiction rests on the party seeking the federal forum." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001).[3] To carry that burden, "the party asserting jurisdiction [must] establish 'that jurisdiction does in fact exist.'" *Hawkins*, 16 F.4th at 152 (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

Courts have "the power to dismiss for lack of subject matter jurisdiction based on any one of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)); *accord Flores v.*

---

[3] Plaintiff questions reliance upon *Howery* because it involved diversity rather than federal question jurisdiction. ECF No. 27 at 11. The Court finds that distinction immaterial. Regardless of jurisdictional basis, the presumption applies, and the burden is at all times on the party seeking to proceed in federal court.

*Pompeo*, 936 F.3d 273, 276 (5th Cir. 2019); *Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). When determining issues of subject matter jurisdiction, the courts "may consider outside matter attached to a motion to dismiss without first converting it into a motion for summary judgment." *State of Ala. ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973).

The Fifth Circuit has long distinguished between "facial" and "factual" jurisdictional attacks. *See Superior MRI Servs., Inc. v. Alliance Healthcare Servs., Inc.*, 778 F.3d 502, 504 (5th Cir. 2015) (citing *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981)). "An attack is 'factual' rather than 'facial' if the defendant 'submits affidavits, testimony, or other evidentiary materials.'" *Id.* When faced with a factual jurisdictional attack, "a plaintiff 'must prove the existence of subject-matter jurisdiction by a preponderance of the evidence' and is 'obliged to submit facts through some evidentiary method to sustain his burden of proof.'" *Id.* (quoting *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989) (internal quotation marks and footnotes omitted), *aff'd sub nom.*, *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990)).

For factual attacks, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Williamson*, 645 F.2d at 413 (quoting *Mortensen v. First Fed. Sav. & Loan Assoc.*, 549 F.2d 884, 891 (3rd Cir. 1977)). On the other hand, a facial attack requires the courts to "consider the allegations of the complaint as true." *Id.* "Regardless of the nature of the attack, the plaintiff seeking a federal forum 'constantly bears the burden of proof that jurisdiction does in fact exist.'" *Chandler v. United States*, 338 F. Supp. 3d 592, 599 (N.D. Tex. 2018) (quoting *Ramming*, 281 F.3d at 161).

The Government makes a factual jurisdictional attack by presenting evidence with its motion to dismiss. Accordingly, the Court does not presume the truthfulness of any allegation of Plaintiff and determines whether jurisdiction exists by examining the complaint as supplemented

16

by undisputed facts evidenced in the record. Because Plaintiff does not contest the facts within the proffered evidence, the Court has no need to resolve any disputed facts.

The circumstances of this case present the issue of sovereign immunity. "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983). When a plaintiff seeks judicial review of an action by a federal agency under 28 U.S.C. § 1331, the courts must determine whether there has been "a waiver of sovereign immunity." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014). The APA may waive such immunity in some circumstances. *See id.* Relying on 5 U.S.C. §§ 702 and 704, the Government argues that there has been no waiver of sovereign immunity in this case.

"Section 702 of the APA waives the United States' sovereign immunity for actions seeking non-monetary relief against federal government agencies." *Cambranis v. Blinken*, 994 F.3d 457, 462 (5th Cir. 2021). This "waiver applies both to statutory claims and to 'non-statutory causes of action against federal agencies arising under 28 U.S.C. § 1331.'" *Id.* (quoting *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 488 (5th Cir. 2014)). The first sentence of § 702 provides the following statutory right of review: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."

Two years ago, this Court had occasion to thoroughly address § 702 and its interplay with § 704 of the APA. *See Cambranis v. Pompeo*, No. 5:19-CV-0238-JKP, 2020 WL 1447380, at *6- 8 (W.D. Tex. Mar. 24, 2020), *aff'd sub nom. Cambranis v. Blinken*, 994 F.3d 457 (5th Cir. 2021). Some of that opinion bears repeating here:

> While § 702 sets out the statutory right to judicial review and the scope of any waiver of sovereign immunity, § 704 of the APA identifies which agency actions are reviewable. In its first sentence, § 704 sets out two types of actions as reviewable: "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." There is a definite interplay between the two types of persons entitled to judicial review set out in the first sentence of § 702 and the two types of agency action deemed reviewable by the first sentence of § 704.

*Id.* at *6.

Although this Court found that the plaintiff had satisfied the § 702 requirements identified in *Alabama-Coushatta*, it also recognized that "[w]hen there appears to be a waiver of sovereign immunity under § 702, the courts should consider whether either enumerated carve-out text of § 702 affects the waiver." *Id.* at *10. Nevertheless, it found such consideration "unnecessary" in the case then before it "because even though Plaintiff ha[d] shown a § 702 waiver of sovereign immunity under *Alabama-Coushatta*, § 704 of itself may present a jurisdictional bar." *Id.* As the Court noted:

> To find that the APA provides a jurisdictional basis for judicial review through 28 U.S.C. § 1331, requires a multi-layered jurisdictional inquiry encompassing sections 701, 702, and 704. But, because it only takes one provision to bar jurisdiction, courts are free to consider the provisions in whatever order they deem warranted. If any provision bars judicial review, the court lacks jurisdiction and may forego further consideration of the APA provisions.

*Id.* at *8. Accordingly, the Court found the waiver of sovereign immunity of § 702 "insufficient to bestow jurisdiction when § 704 has taken it away." *Id.* at *10. It then proceeded to discuss why § 704 provided an independent jurisdictional basis for dismissing the case. *See id.* at *10-12.

In affirming the jurisdictional dismissal, the Fifth Circuit expressly relied on § 702 and noted that it did "not reach whether § 704 serves as an independent jurisdictional bar to [the plaintiff's] constitutional claim." *Blinken*, 994 F.3d at 462. By not reaching the § 704 issue, the Fifth Circuit left this Court's analysis untouched. Thus, until binding precedent dictates otherwise or to the extent non-binding precedent might provide persuasive reasons to alter course, the Court

18

continues to find its opinion instructive. Nothing in the affirmance presents a reason to revisit the § 704 jurisdictional issue. Instead, *Blinken* simply provides binding precedent that § 702 of itself is a jurisdictional bar under the facts then presented.

This case presents the jurisdictional issue of whether there is any final agency action. "When, as here, the relevant administrative agency statutory provisions do not directly provide for judicial review, the APA authorizes judicial review only of 'final agency action.'" *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 287 (5th Cir. 1999) (quoting 5 U.S.C. § 704; *Lujan v. Nat'l Wildlife Federation*, 497 U.S. 871, 882 (1990)). Absent "'final agency action,' as required by the controlling statute, a court lacks subject matter jurisdiction." *Id*. (citing *Veldhoen v. U.S. Coast Guard*, 35 F.3d 222, 225 (5th Cir. 1994)).

With certain exclusions not relevant here, "agency" within the meaning of the APA, "means each authority of the Government of the United States, whether or not it is within or subject to review by another agency. 5 U.S.C. §§ 551(1), 701(b)(1). The APA defines "agency action" as including "the whole or a part of an agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." *Id*. § 551(13). In general, agency action must satisfy "two conditions" in order "to be 'final' under the APA": (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature" and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow."[4] *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997)).

In determining "when an agency action is final," courts consider, "among other things,

---

[4] Plaintiff notes that "courts in the D.C. Circuit often evaluate three additional factors." ECF No. 27 at 11 n.9. But the cited cases pre-date *Hawkes*, and Plaintiff presents no binding precedent requiring consideration of other factors. Absent Supreme Court precedent or precedent of the Fifth Circuit supporting such consideration, the Court declines to consider other factors.

whether its impact 'is sufficiently direct and immediate' and has a 'direct effect on . . . day-to-day business.'" *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 152 (1967)). Further, "agency action is not final if it is only 'the ruling of a subordinate official,' or "tentative.'" *Id*. (quoting *Abbott Labs*., 387 U.S. at 151). At the core of this finality "question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Id*. The Supreme Court, furthermore, has "long taken" a pragmatic approach as to finality. *Hawkes*, 578 U.S. at 599; *accord Texas v. Equal Emp. Opportunity Comm'n*, 933 F.3d 433, 441 (5th Cir. 2019).

The parties here do not disagree as to what has transpired at the administrative level. Plaintiff, however, argues that two sets of "final agency action" are at issue in this case. ECF No. 27 at 9. It first points to purported final decisions of the HHS invoking SCA jurisdiction and including or attempting to include SCA clauses in cooperative agreements and related notice of awards. *See id*. (relying on ECF No. 1-4 through 1-13, 1-19, 1-21, and 1-23). Second, it points to purported final decisions of the DOL that precipitated and ratified or endorsed the jurisdictional determinations of the HHS. *See id*. at 9-10 (relying on ECF No. 1-3, 1-15, and ECF No. 27-3 (Ex. 28); and App'x 72-73). It argues that these decisions are final agency action for purposes of APA jurisdiction because they are not appealable to any internal agency administrative forum. *Id*. at 10.

Despite the arguments of Plaintiff, the Court finds that Plaintiff has not carried its burden to show that federal jurisdiction exists. Based on the matters before it, the Court finds no final agency action. First, neither the cooperative agreements themselves nor the notices of award issued by HHS-ORR mark the consummation of the decision-making process. Final authority for determining SCA coverage lies with the DOL, not HHS. *See* 29 U.S.C. § 4.101(b); *Univs. Rsch. Ass'n*, 450 U.S. at 761 n.9. Because final authority regarding SCA coverage lies with the DOL it does not matter whether the HHS may have concluded its decision-making process. Determinations

regarding the SCA are subject to review by the DOL. Consequently, any HHS determination regarding the SCA is merely tentative until the DOL makes a final agency determination. That § 4.101(b) places final authority with the DOL necessarily divests the HHS of any ability to take final agency action regarding the SCA. As recited above, implementing regulations provide a comprehensive administrative scheme for enforcing SCA's provisions and for reconsidering coverage determinations. Absent a final decision by the DOL, there is no final decision relative to the matters raised in this action. Thus, even if the Departmental Appeals Board of the HHS lacks jurisdiction to hear Plaintiff's challenge to SCA's applicability, such fact is immaterial to finality in this instance.

Although Plaintiff has initiated the DOL's administrative review process for coverage determinations, *see* Compl. ¶¶ 56-57, 60-61; ECF Nos. 1-14, 1-16, 1-17; the creation of the administrative record remains incomplete due to the agency's lack of written response. A written response to Plaintiff's objections is a prerequisite for proceeding to the next step in the administrative process, namely, reconsideration by the ARB, the entity vested with authority to make final agency decisions regarding SCA coverage. *See* 29 C.F.R. § 8.7(b); Delegation of Authority, 2020 WL 1065013, ¶ 5(a)(2).

Plaintiff argues that this DOL administrative review process "is limited solely to the mixed fact/law question of 'how' the SCA will be applied (based on an assumption of SCA jurisdiction) and not the threshold legal jurisdictional question of 'whether' the SCA can be applied in the first place." ECF No. 27 at 15. Although Plaintiff makes this argument through a three-pronged attack based on 29 U.S.C. § 8.1(b) and the delegation of authority to the ARB, *see id.* at 15-17, the attack is ultimately toothless.

While 41 U.S.C. § 6707(a) does not mandate any administrative review of SCA jurisdiction determinations, it does grant the Secretary of the DOL authority to prescribe regulations such as

those set out in 29 C.F.R. §§ 4.1 et seq., §§ 6.1 et seq., §§ 8.1 et seq. And the DOL has prescribed

§ 8.1(b) to describe the ARB's jurisdiction. The Court previously set out the text of the regulation

but addressing Plaintiff's argument requires a careful parsing of the text. To aid in that endeavor,

the Court restates the regulation in pertinent part. The regulation states that the ARB

> has jurisdiction to hear and decide in its discretion appeals concerning questions of
> law and fact from final decisions of the Administrator of the Wage and Hour Divi-
> sion or authorized representative . . . arising under the Service Contract Act and the
> Contract Work Hours and Safety Standards Act where the contract is also subject
> to the Service Contract Act. The Board shall not have jurisdiction to pass on the
> validity of any portion of the Code of Federal Regulations which has been duly
> promulgated through notice and comment by the Department of Labor and shall
> observe the provisions there-of, where pertinent, in its decisions

This regulation is consistent with the DOL's delegation of authority and assignment of responsi-

bility to the ARB to act for the Secretary of Labor, which likewise authorizes the ARB to review

final decisions of the WHD under the SCA and "the Contract Work Hours and Safety Standards

Act, 40 U.S.C. 3701 et seq. (except matters pertaining to safety) where the contract is also subject

to the [SCA]." Delegation of Authority, 2020 WL 1065013, ¶ 5(a)(2).

Plaintiff mistakenly inserts "mixed" into the language of § 8.1(b). The regulation does not

include that word and there is no basis to read it into the regulation. The regulation provides juris-

diction to the ARB to hear and decide appeals concerning both questions of law and questions of

fact. Of course, if an appeal concerns a mixed question of law and fact, the ARB has jurisdiction

to hear such appeal. But the ARB's jurisdiction is not limited solely to such mixed questions.

Next, Plaintiff mistakenly interprets "where the contract is . . . subject to the Service Con-

tract Act," in § 8.1(b) to mean that the

> regulatory grant of jurisdiction presumes that there is a 'contract' and that SCA
> jurisdiction already exists as to any question the ARB may be asked to decide re-
> lated to that "contract" and does not vest the ARB with authority to make statutory
> jurisdictional decisions of the kind at issue in this case.

*See* ECF No. at 16-17. The language following the ellipses clearly relates to the Contract Work

Hours and Safety Standards Act, not the SCA. Replacing the ellipses with the word omitted by Plaintiff – "also" – enhances the clarity and connection. The connection is further supported by the same language used in the Delegation of Authority. Properly connecting the "subject to" language erodes Plaintiff's argument.

Plaintiff also contends that the final sentence of the above-quoted portion of § 8.1(b) removes any jurisdiction to review regulations promulgated by the DOL. However, an inability to invalidate regulations provides no basis to prohibit their interpretation. This contention fails.

In a broader sense, Plaintiff focuses on use of the phrases "arising under" in § 8.1(b) and "under" in the delegation of authority. ECF No. 27 at 15-16. It interprets both phrases as excluding the threshold issue of whether the SCA should apply. But there is no reasonable basis for such exclusion. Plaintiff interprets the phrases too narrowly. The DOL and its delegate have final authority to review decisions that either wrongly or correctly finds that the SCA applies or does not apply. Even if the DOL agrees that the SCA is inapplicable on a set of given facts, the applicability determination is under the SCA and arises under the SCA.

For these reasons, the Court finds that the DOL has not taken final agency action through the administrative review process for coverage determinations.

In addition, the WHD has not completed its investigations into Plaintiff's and a subcontractor's compliance with the SCA provision of amended Cooperative Agreement 90ZU0224. *See* Compl. ¶¶ 58, 62-63. This is the first required step in the administrative enforcement process that culminates in a decision by the ARB and during which Plaintiff may raise its coverage objections as a defense. *See* 29 C.F.R. §§ 4.187(f), 6.15-6.16, 8.1(b). Absent such a decision by the ARB, there is no final agency action through the enforcement process.

Although Plaintiff argues that it need not "await enforcement proceedings before challenging final agency action where such proceedings carry the risk of serious criminal and civil

23

penalties," ECF No. 27 at 24 (quoting *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590, 600 (2016)), it identifies no criminal penalties that may flow from waiting for enforcement proceedings. It states that "the presumptive statutory penalty for noncompliance with the SCA (assuming SCA jurisdiction extends to cooperative agreements) is debarment (41 U.S.C. § 6706(b)), the 'death penalty' of federal procurement law." ECF No. 27 at 25. As Defendants acknowledge, Plaintiff risks exposure to a significant civil penalty as it waits for the agency to complete its decision-making process. *See* ECF No. 29 at 13. Under the circumstances of this case, the Court need not and will not rely on potential enforcement proceedings to find a lack of final agency action given Plaintiff's alternate avenue to obtain final agency action through the previously discussed administrative review process for coverage determinations.

Plaintiff presents other arguments for why the Court should find final agency action in this case. It argues that the three opinion letters from the DOL to the HHS, (ECF Nos. 1-1, 1-2, and 1-3), as ratified by Jessica Looman in the videoconference held on July 1, 2021, and her letter dated July 5, 2021, (ECF No. 27-3), mark the consummation of the DOL's decision-making process. ECF No. 27 at 18. It submits that this series of events equates to final agency action because (1) the letters constitute a "published interpretation" approved by the head of the agency, (2) the interpretation "is the product of the process provided by the agency," and (3) "the interpretation is not labeled as tentative or otherwise qualified by arrangement for reconsideration. *See id*. (quoting *Student Loan Mktg. Ass'n v. Riley*, 104 F.3d 397, 405 (D.C. Cir. 1997)).

For the reasons the Government states in its motion to dismiss, *see* ECF No. 24 at 15-17, the Court agrees that the personal appearance of the WHD Acting Administrator, Jessica Looman, at the videoconference held on July 1, 2021, does not render any DOL coverage determination final. In addition to other distinguishing characteristics, the DOL's SCA regulations provide a set procedure for seeking reconsideration of a WHD Administrator's coverage determination, which

serves both to confirm the WHD Administrator's coverage determinations are subject to reconsideration and set forth the means of obtaining such reconsideration. Thus, any alleged oral statements attributed to Looman during the videoconference are merely initial determinations that, if later put into writing, would be subject to reconsideration by the ARB on a petition for review through 29 C.F.R. §§ 8.1(b)(6), 8.7. Furthermore, the letter dated July 5, 2021, merely memorialized a discrete, negotiated agreement between Plaintiff and WHD regarding the Carrizo Springs facility. It neither reflects any final agency action nor the consummation of the DOL decision-making process. And for the reasons stated by the Government in its reply, see ECF No. 29 at 9-12, *Riley* is both distinguishable and not on point.

Similarly, the 2014 letter (ECF No. 1-1) does not mark the consummation of any decision-making process because (1) the letter is signed by a subordinate, not the WHD Administrator and (2) as discussed in paragraph above, any decision by the Administrator is subject to reconsideration through the regulatory process.

Not only has the DOL not completed the decision-making process, but it has also not made a decision that is, as of yet, definitive as to Plaintiff's rights and obligations. Plaintiff's alleged legal consequence, debarment, remains just a speculative and contingent possibility at this point. Such consequence may result from the administrative process. But without completion of such process, it is not a certainty. Still, as Defendants acknowledge, "although debarment is merely a speculative and contingent possibility at this juncture," Plaintiff does risk exposure to a significant civil penalty while waiting for completion of the decision-making process. ECF No. 29 at 13. In any event, the failure to satisfy the first element required for final agency action dooms Plaintiff on this jurisdictional issue whether or not the Court finds the second element satisfied. *See Hawkes*, 578 U.S. at 597 ("distill[ing] from [Supreme Court] precedents two conditions that generally must be satisfied for agency action to be 'final' under the APA"); *Nasdaq Stock Mkt. LLC v. Sec. &*

*Exch. Comm'n*, 1 F.4th 34, 39 (D.C. Cir. 2021) (recognizing that courts "need not address the second" element when the first element is not satisfied).

Plaintiff would have the Court apply an exception to finality articulated in *Leedom v. Kyne*, 358 U.S. 184 (1958), because WHD's coverage determination is, in its view, contrary to the "plain language of the SCA, the SCA's legislative history, the plain language of the FGCAA, and DOL's SCA regulations." Compl. ¶¶ 94-95; ECF No. 27 at 26-27. But as examined by the Fifth Circuit, this exception does not apply here for several reasons. *See Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999).

First, in general, courts "have interpreted *Kyne* as sanctioning the use of injunctive powers only in a very narrow situation in which there is a 'plain' violation of an unambiguous and mandatory provision of the statute." *Id*. (quoting *Boire v. Miami Herald Pub. Co.*, 343 F.2d 17, 21 (5th Cir. 1965)). Second, "access to the courts is accorded only if the agency's interpretation 'is infused with error which is of a summa or magna quality as contraposed to decisions which are simply cum error. Only the egregious error melds the [agency's] decision into justiciability. Lesser malignancies thwart the jurisdiction of the courts.'" *Id*. (quoting *United States v. Feaster*, 410 F.2d 1354, 1368 (5th Cir. 1969)). Moreover, "the exception allowing review of an 'agency action allegedly in excess of authority must not simply involve a dispute over statutory interpretation. . . . [T]he agency's challenged action [must be] so contrary to the terms of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute.'" *Id*. (omitting internal quotation marks and quoting *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997)).

Not only do those three reasons support not applying the *Kyne* exception in this case, but unlike *Kyne*, this case does not involve any concession "by the agency itself" of "the lawlessness of the agency's action." *See id*. Like the agency action at issue in *American Airlines*, Plaintiff's

challenge of the inclusion of SCA clauses and wage determinations in the cooperative agreements "involve[] a dispute over whether an agency charged with a statute's implementation has interpreted it correctly, which is not the sort of 'egregious' error envisioned by the Supreme Court in *Kyne*." *See id*. Indeed, unlike the statue at issue in *Kyne*, nothing in the plain language of the SCA expressly precludes WHD's interpretation of the Act's applicability. Through 41 U.S.C. § 6702(a), the SCA applies to "any contract" in excess of $2,500 that "has as its principal purpose the furnishing of services in the United States through the use of service employees." While the statute exempts certain types of contracts, it does not list cooperative agreements in the exempted types. *See* 41 U.S.C. § 6702(b). By its express terms, the SCA applies to more than "procurement contracts." Thus, the facts do not show any "'plain' violation of an unambiguous and mandatory provision of the [Act]." *See Am. Airlines*, 176 F.3d at 293.

Further, the interplay between SCA and FGCAA does not show any plain violation of any unambiguous and mandatory provision of either Act. When Congress enacted the SCA it knew of the distinction between contracts governed by that Act and grants governed by the Grants Act. But the covered grants were extremely limited and dealt with scientific research. One cannot engraft knowledge to Congress in 1965 that it would later enact the FGCAA and its tri-distinctions between more general grants, cooperative agreements, and contracts (later clarified to mean procurement contracts).

When Congress enacted the FGCAA, it presumably knew of the scope and breadth of the SCA, but it took no steps to limit the SCA. Enactment of the FGCAA did not silently repeal the SCA as to cooperative agreements. As recognized by the Supreme Court, "repeals by implication are not favored and are a rarity, [and when p]resented with two statutes, the Court will regard each as effective—unless Congress' intention to repeal is clear and manifest, or the two laws are irreconcilable." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020) (citations

and internal quotation marks omitted).

And when Congress amended the SCA in 2011, one can presume that it knew of the FGCAA distinctions between cooperative agreements and procurement contracts, but Congress did not include cooperative agreements in the list of exempted contract types. Moreover, in recodifying the SCA, Congress expressed an intent that the amendments were simply "to conform to the understood policy, intent, and purpose of Congress in the original enactments, with such amendments and corrections as will remove ambiguities, contradictions, and other imperfections." Act of Jan. 4, 2011, Pub. L. No. 111-350, § 2(b), 124 Stat. 3677, 3677.

The various statutory provisions do not mean that Congress intended cooperative agreements to be mutually exclusive from contracts in general. Congress set out the principal purposes of contracts for SCA purposes and the various funding instruments addressed in the FGCAA. The stated principal purposes do not appear to be mutually exclusive.

Plaintiff's recitation of the various statutory histories and interpretations therefrom highlight the lack of any plain violation sufficient to justify applicability of the *Kyne* exception. Accepting that a cooperative agreement cannot be a procurement contract under the FGCAA does not mean that a cooperative agreement cannot be a contract within the meaning of the SCA. The Court does not view cooperative agreements as necessarily mutually exclusive from contracts within the meaning of the SCA.

And, unlike *Kyne*, the APA expressly provides Plaintiff "with a meaningful and adequate opportunity for judicial review" of the DOL's final decision. Plaintiff will have such opportunity after the DOL has issued a final decision, thus bringing it within the type of action that may be reviewable through 5 U.S.C. §§ 702 and 704. As was the case in *American Airlines*, the "administrative proceedings which [Plaintiff] seeks to have [this] court[] short-circuit will determine [Plaintiff]'s ultimate rights and obligations, and, may avert judicial review altogether." *See* 176

F.3d at 292.

Although Plaintiff contends that *U.S. Army Corps of Engineers v. Hawkes Co.*, 578 U.S. 590 (2016) makes clear that this case involves final agency action, *see* ECF No. 27 at 10, the Court does not see the clarity that Plaintiff purports to see. *Hawkes* involved an approved jurisdictional determination that consummated the agency's decision-making process, definitively ruled on the issue, and gave rise to direct and appreciable legal consequences. *See* 578 U.S. at 598. As discussed above, this case does not involve any consummation of the DOL's decision-making process. And although the Court did not make any definitive finding regarding whether the DOL definitively ruled on the issue, the Court disagrees that *Hawkes* dictates a finding of final agency action in this case.

While Plaintiff foresees only delay before receiving an adverse ARB decision, the dispositive issue before this Court renders this Court without jurisdiction to adjudicate the merits of Plaintiff's APA action. Under the undisputed facts, there is no final agency action that permits jurisdiction under 5 U.S.C. §§ 702, 704. Although the parties disagree on many aspects of the law, the Court has issued the legal rulings necessary to resolve the jurisdictional issue presented. Given the passage of time since Plaintiff commenced this action, the Court expects the DOL to complete its administrative review process for coverage determinations in a quick and efficient manner. Because the parties have exhibited an ability to work together to amicably address some matters in this case, perhaps that spirit of cooperation can aid them in efficiently working through the administrative process in an effort to minimize delay, cost, and apprehension that might flow from the uncertain administrative path.

## VI. CONCLUSION

For the foregoing reasons the Court **GRANTS** *Defendants' Motion to Dismiss* (ECF No. 25) and finds that the Court lacks subject matter jurisdiction over this action for lack of final agency

action required by 5 U.S.C. § 704. It **DENIES** *Plaintiff's Request for Oral Hearing* (ECF No. 30), and because it grants the motion to dismiss, it **MOOTS** *Plaintiff's Motion for Preliminary Injunction* (ECF No. 6), which the Court has converted to summary judgment; and *Defendants' Alternative Cross-Motion for Summary Judgment* (ECF No. 25). By separate document, the Court will issue a Final Judgment to dismiss this action for lack of jurisdiction.

**IT IS SO ORDERED this 17th day of March 2022.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**